563 F.2d 588
 GULF OIL CORPORATION, Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent,
Philadelphia Gas Works, Texas Eastern Transmission
Corporation, Milton Clark, Frederick W. Rose, and St. Regis
Apartment, Ltd., on behalf of themselves and all others
similarly situated (PGW's customers), Washington Urban
League, Public Service Electric and Gas Company, Connecticut
Public Utilities Control Authority, Massachusetts Department
of Public Utilities, Rhode Island Division of Public
Utilities and Carriers, Rhode Island Attorney General and
Rhode Island Customers' Council (New England), Public
Service Commission of the State of New York, the Brooklyn
Union Gas Company, Philadelphia Electric Company, Intervenors.
CONNECTICUT PUBLIC UTILITIES CONTROL AUTHORITY,
Massachusetts Department of Public Utilities, Rhode Island
Division of Public Utilities and Carriers, Rhode Island
Attorney General, and Rhode Island Consumers' Council, Petitioners,
v.
FEDERAL POWER COMMISSION, Respondent,
Philadelphia Gas Works, Gulf Oil Corporation, Bay State Gas
Company, Boston Gas Company, Bristol and Warren Gas Company,
Cape Cod Gas Company, Commonwealth Gas Company, the
Connecticut Gas Company, Connecticut Natural Gas
Corporation, Fall River Gas Company, the Hartford Electric
Light Company, Town of Middleborough, Municipal Gas and
Electric Department, New Bedford Gas and Edison Light
Company, North Attleboro Gas Company, City of Norwich,
Department of Public Utilities, Pequot Gas Company,
Providence Gas Company, South County Gas Company, the
Southern Connecticut Gas Company, Tiverton Gas Company,
Public Service Electric and Gas Company, Milton Clark,
Frederick W. Rose and St. Regis Apartments, Ltd. (PGW's
customers), Algonquin Gas Transmission Company, Philadelphia
Electric Company, Intervenors.
 Nos. 76-2596 and 77-1050.
 United States Court of Appeals,
Third Circuit.
 Argued June 7, 1977.
Decided Sept. 7, 1977.
 
 Carroll L. Gilliam, Grove, Jaskiewicz, Gilliam & Cobert, Washington, D.C., for petitioners Gulf Oil in No. 76-2596 and as intervenor in 77-1050.
 R. Daniel Prentiss, Dept. of Atty. Gen., Division of Civil Litigation & Charitable Trusts, Providence, R. I., for petitioners Connecticut Public Utilities Control Authority, et al.
 Allan Abbot Tuttle, Sol. F. P. C., Washington, D.C., for respondent.
 
 
 1
 James W. McCartney, Vinson, Elkins, Searls, Connally & Smith, Houston, Tex., for intervenor, Texas Eastern Transmission Corp.
 
 
 2
 Morton L. Simons, Simons & Simons, Washington, D.C., for intervenor, Washington Urban League.
 
 
 3
 Drexel D. Journey, Gen. Counsel, Robert W. Perdue, Deputy Gen. Counsel, Allan Abbot Tuttle, Sol., Scott M. DuBoff, Edgar K. Parks, Attys., F.P.C., Washington, D.C., for Federal Power Commission.
 
 
 4
 Warren M. Sparks, Sparks & Sparks, Tulsa, Okl., B. James McGraw, Gulf Oil Corp., Houston, Tex., Carroll L. Gilliam, Keith R. McCrea, Craig W. Hulvey, Washington, D.C., for Gulf Oil Corp., of counsel, Grove, Jaskiewicz, Gilliam & Cobert, Washington, D.C.
 
 
 5
 R. Daniel Prentiss, Sp. Asst. Atty. Gen., Dennis J. Roberts, II, Andrew L. Niven, Legal Analyst Southern New England Regulatory Project, Providence, R. I., for Connecticut Public Utilities Control Authority, et al.
 
 
 6
 Jack D. Head, Houston, Tex., James W. McCartney, Judy M. Johnson, Atty., Vinson & Elkins, Houston, Tex., for Texas Eastern Transmission Corp.
 
 
 7
 A. Grant Sprecher, Stephen Schachman, Barry J. Hart, Obermayer, Rebmann, Maxwell & Hippel, Philadelphia, Pa., for Philadelphia Gas Works.
 
 
 8
 Thomas E. Wiener, Goodis, Greenfield, Henry & Edelstein, Philadelphia, Pa., for Customers of Philadelphia Gas Works.
 
 
 9
 Peter H. Schiff, Gen. Counsel, The Public Service Commission of the State of New York, Albany, N. Y., Richard A. Solomon, Sheila S. Hollis, Atty., Wilner & Scheiner, Washington, D.C., for The Public Service Commission of the State of New York.
 
 
 10
 Barbara M. Gunther, Atty., Michael W. Hall, Cullen & Dykman, Brooklyn, N. Y., for The Brooklyn Union Gas Co.
 
 
 11
 Morton L. Simons, Simons & Simons, Washington, D.C., Victor H. Kramer, David C. Vladeck, Institute for Public Interest Representation, Washington, D.C., for Washington Urban League.OPINION OF THE COURT
 
 
 12
 Before SEITZ, Chief Judge, ALDISERT and ROSENN, Circuit Judges.
 
 
 13
 MAX ROSENN, Circuit Judge.
 
 
 14
 These petitions raise numerous questions concerning an order by the Federal Power Commission ("FPC") requiring Gulf Oil Corporation ("Gulf") to deliver to the pipelines of the Texas Eastern Transmission Company ("Texas Eastern") large quantities of natural gas. Gulf urges that the FPC order be set aside, several New England states ("New England")[1] ask that the order be modified, and a group of intervenors[2] argue that the Commission's order should be enforced in full. Finding no merit in either Gulf's or New England's petition, we affirm the Commission's order without modification.
 
 I. BACKGROUND
 
 15
 This dispute grows out of a certificate of public convenience and necessity issued to Gulf by the FPC in 1964. That certificate followed a 1963 "Precedent Agreement" between Gulf and Texas Eastern wherein they agreed to enter into a "Gas Purchase Contract" upon the receipt by each of an appropriate certificate from the FPC.
 
 
 16
 Upon issuance of the certificates, Gulf commenced performance in accordance with the terms of the contract and the certificate. Within a few years, however, Gulf discovered that it had vastly overestimated the reserves of its West Delta Block 27 Field located in Plaquemines Parish, Louisiana, the field from which Gulf had expected to draw most of the natural gas for the Texas Eastern contract. In 1971, citing the mistake in its reserve estimate, Gulf applied to the Commission for a certificate amendment increasing the price at which it supplied gas to Texas Eastern. In Opinion Nos. 692 and 692-A, issued in 1974, the FPC denied Gulf's application for an amendment and Gulf did not seek judicial review of the Commission's decision.
 
 
 17
 Since 1973, Gulf's deliveries to Texas Eastern have fallen short of Texas Eastern's demands and since 1974, short of the contract specified quantities. On November 7, 1975, the FPC issued the show cause order which initiated this proceeding. After a hearing, the Administrative Law Judge concluded that Gulf was obligated to deliver greater quantities of gas than it had been and he ordered certain performance and refunds on the part of Gulf. The Commission, in Opinion No. 780, agreed with the conclusions of the Administrative Law Judge. Gulf and a number of other parties petitioned for rehearing but in Opinion No. 780-A the Commission held to its prior decision. This appeal followed.
 
 
 18
 On review, we are empowered to "affirm, modify, or set aside (the Commission's) order in whole or in part," Section 19(a) of the Natural Gas Act of 1938, 15 U.S.C. § 717r (1970). The scope of our review is defined by the Administrative Procedure Act, 5 U.S.C. § 706 (1970).[3]II. GULF'S DELIVERY OBLIGATIONS
 
 
 19
 The first question before us concerns the quantity of gas which Gulf is obligated to deliver. The Commission found that under the certificate of public convenience and necessity, Gulf is obligated to deliver 625,000 MCF (thousand cubic feet) of gas per day to Texas Eastern except when Texas Eastern demands less. Gulf maintains that its obligation, if any, is limited to 500,000 MCF per day.
 
 
 20
 Although our concern is with the meaning of the certificate, see Sunray Mid-Contract Oil Co. v. FPC, 364 U.S. 137, 152-54, 80 S.Ct. 1392, 4 L.Ed.2d 1623 (1960), it is to the Gulf-Texas Eastern contract that we must turn. The reason is that the certificate alone has little substance. At its core is the incorporation by reference of Gulf's application; the application in turn refers to the terms of the precedent agreement and the gas purchase contract. The scope of the certificate, therefore, is in large part defined by the terms of the contract.[4]
 
 
 21
 Several provisions of the contract are relevant to this issue. The first is Article II, P 1(a), which provides that after a start-up period ending on November 1, 1968, the "Daily Contract Quantity" will be established at 500,000 MCF per day. The second relevant provision is Article I ("Scope of Agreement"), P 4:
 
 
 22
 Seller (Gulf) warrants and agrees that there will be provided under the terms of this Agreement a quantity of gas sufficient to enable Seller to have available for delivery hereunder on any day or days a volume not less than one hundred twenty-five per cent (125%) of the Daily Contract Quantity . . . .
 
 
 23
 Article II ("Quantity of Gas") contains two additional provisions of importance. Under paragraph 1(b), Texas Eastern agreed to purchase or pay for if available and not taken
 
 
 24
 a quantity of gas equal to eighty per cent (80%) of the sum of (the) Daily Contract Quantity . . . multiplied by the number of days in (the) year . . . .
 
 
 25
 Paragraph 1(c) gives Texas Eastern the right
 
 
 26
 to purchase from Seller hereunder at any time, and from time to time, quantities of gas greater than the Daily Contract Quantity . . . ; provided that Seller shall not be obligated to deliver in any day a quantity of gas in excess of one hundred twenty-five per cent (125%) of (the) Daily Contract Quantity.
 
 
 27
 Another relevant provision, Article XII states:
 
 
 28
 This Agreement shall . . . remain in full force and effect for a term of twenty-six (26) years from the date of initial deliveries of gas hereunder, or to the date on which four billion four hundred thirty-seven million six hundred seventy-five thousand (4,437,675,000) MCF of gas . . . has been delivered to Buyer(,) whichever shall first occur.
 
 
 29
 Gulf insists that if these provisions of the contract are read together, it becomes clear that some sort of "swing" in deliveries is contemplated. In Gulf's view, Texas Eastern is entitled to receive and Gulf is obligated to provide no more than the Daily Contract Quantity ("DCQ") 500,000 MCF except on those "infrequent days when customers create a peak demand on (Texas Eastern's) system." On days when Texas Eastern experiences a light demand, on the other hand, Texas Eastern need take no more than 80 percent of the DCQ. Thus, according to Gulf, the provisions of P 1(b) and P 1(c) of Article II are, in a sense, reciprocal the contract contemplates that "swings" one way or another over the course of the contract will ultimately balance out so that the delivery of the 4,437,675,000 MCF[5] (or 4.4 TCF) will be completed on or about the 26th anniversary of the Agreement. The conclusion which Gulf draws is that the contract does not entitle Texas Eastern to receive the full 125 percent of the DCQ 625,000 MCF day after day on a regular basis.
 
 
 30
 The FPC responds to Gulf's argument by first noting that since 1973 Texas Eastern has consistently demanded delivery of 625,000 MCF every day. The Commission's view is that Gulf's obligation to deliver 125 percent of the DCQ is contingent on nothing but Texas Eastern's demand; once the demand is made, the obligation becomes operative.
 
 
 31
 In our own analysis of the contract, we find one important factor supporting Gulf's interpretation: the use of the term "Daily Contract Quantity." These three words standing alone imply that 500,000 MCF is the normal daily quantity of gas which Gulf must deliver and Texas Eastern is required to buy. Arrayed against this single factor, however, are other factors which militate against Gulf's theory. First is the unequivocal and unconditional warranty contained in Article I, "Scope of Agreement": "Seller warrants . . . to have available for delivery . . . on any day or days a volume not less than one hundred twenty-five percent . . . of the Daily Contract Quantity." (Emphasis supplied.) Moreover, if the 80 percent DCQ provision and the 125 percent DCQ provision were intended to be reciprocal, as Gulf contends, the mention of one without the other in the Scope of Agreement would be most unlikely.
 
 
 32
 We believe that Article II, "Quantity of Gas," lends further support to the Commission's interpretation. Nowhere in that Article is Gulf's daily obligation limited to the DCQ. On the contrary, the article speaks only of Texas Eastern's right to purchase "at any time, and from time to time" as much as 125 percent of the DCQ.
 
 
 33
 Another important consideration also militates against Gulf's contention that the contract established a "swing" in Gulf's gas delivery obligations rather than an absolute obligation to deliver 125 percent of the DCQ upon demand. Such a construction of the contract is unreasonable since it would render the parties' rights and obligations uncertain and indefinite. A contract should be construed, if possible, so as to sustain it rather than convert it into something vague and unenforceable and we will not strain the language of a vital provision of this contract to create an ambiguity where none exists. See H. K. Porter Company v. Wire Rope Corp. of America, Inc.,367 F.2d 653 (8th Cir. 1966); Ness v. National Indemnity Company of Nebraska, 247 F.Supp. 944 (D.C. Alaska 1965).
 
 
 34
 We recognize that the question is close. We are particularly disturbed by the failure of the FPC and the intervenors to explain satisfactorily the use of the words "Daily Contract Quantity." Nevertheless, when we weigh that term against the other factors, particularly the warranty of 125 percent of the DCQ, we are persuaded that the Commission's interpretation is more harmonious with the contractual language than is the interpretation urged by Gulf. We therefore accept the Commission's interpretation and we will affirm the Commission's holding that Gulf is obligated to deliver 625,000 MCF every day unless Texas Eastern demands less until the contract expires.[6]III. ARBITRATION
 
 
 35
 On November 20, 1975, two weeks after the Commission issued the show cause order, Gulf by letter to Texas Eastern invoked the arbitration clause of the agreement:
 
 
 36
 Any dispute arising between Seller and Buyer out of this Agreement shall be determined by a board of three arbitrators to be selected for each such controversy so arising . . . . Such board shall determine the matters submitted to it pursuant to the provisions of this Agreement. The action of a majority of the members of such board shall govern and their decision in writing shall be final and binding on the parties hereto.
 
 
 37
 Gulf requested arbitration on the issue whether Gulf's delivery obligations were wholly or partially excused by (1) commercial impracticality, (2) mutual mistake, or (3) force majeure.[7] In the proceeding before the FPC, Gulf requested that the Commission reserve its rulings on these issues until it had received the decision of the arbitration board. Gulf now seeks review of the Commission's refusal to defer to the arbitrators.
 
 
 38
 Gulf's argument is that its certificate obligation is co-extensive with its contractual obligation, that the extent of its contractual obligation is to be determined by arbitration, and, therefore, that the Commission cannot possibly decide whether Gulf is complying with its certificate until the arbitration board decides whether Gulf's performance is adequate under the contract. Gulf contends that the Federal Arbitration Act, 9 U.S.C. §§ 1-14 (1970),[8] evidences a strong Congressional policy favoring arbitration of contract disputes, J. S. & H. Construction Co. v. Richmond County Hospital Authority, 473 F.2d 212 (5th Cir. 1973), and that regulatory agencies are not exempt from this policy. William E. Arnold Co. v. Carpenters Dist. Council, 417 U.S. 12, 16-17, 94 S.Ct. 2069, 40 L.Ed.2d 620 (1974). In granting a certificate based on the contract, Gulf maintains, the Commission effectively gave its approval to the contract's arbitration clause. In Gulf's view, the Commission should not now be permitted to deny the validity of arbitration as the means for resolving contract disputes. We disagree with Gulf's analysis.
 
 
 39
 By its terms, the arbitration clause of the contract applies only to disputes "arising between Seller and Buyer out of this Agreement," whereas the instant case is a dispute between Gulf and the FPC arising out of the certificate. We discern no inconsistency in the Commission's approval of arbitration as a means of resolving disputes between Gulf and Texas Eastern and the Commission's refusal to defer to arbitration for the resolution of disputes between Gulf and the FPC.
 
 
 40
 Gulf's argument, in essence, is that since the scope of Gulf's certificate obligation is defined by the contract and the contract calls for questions of interpretation to be decided by arbitration, it follows that Gulf's obligation under the certificate is to be decided by arbitration. Although we accept the premises of this argument, our reading of the arbitration clause and the responsibilities of the Commission under the Natural Gas Act do not allow us to agree with the conclusion.
 
 
 41
 The FPC is charged with the public responsibility to enforce the certificate, and in the performance of its duty, the Commission necessarily must resort to the terms of the contract. But this does not mean that the Commission becomes in any sense a party to the contract bound by the mutual obligations between the parties themselves. The reciprocal promises between Gulf and Texas Eastern to resolve their disputes by arbitration are inapplicable to the Commission's duty to enforce the certificate of public convenience.
 
 
 42
 We are not persuaded by the cases which Gulf cites as authority for the contrary conclusion.[9] Each of these cases involves the division of responsibility between a court and arbitrator where the parties had previously agreed to arbitrate the very dispute before the court. In contrast, the issue in the instant case is the interpretation of Gulf's public service obligation under its certificate, the interpretation of which can only be within the FPC's exclusive jurisdiction and which is not subject to arbitration. None of the cases cited by Gulf concerns the question whether a regulatory agency seeking to enforce a certificate issued by it must defer to arbitration merely because the certificated party has agreed in a sales contract with a customer to arbitrate disputes between them. Moreover, none involves a governmental agency which has an independent interest as a regulatory body in the enforcement of the terms of its certificate of public convenience.
 
 
 43
 The futility of the procedure which Gulf proposes also concerns us. Although Gulf claims the right to arbitrate the issues of contract interpretation, it does not contend that the results would in any sense be binding on the Commission. Gulf urges only that the Commission should not have decided this case without the benefit of the arbitrators' previous resolution of the same issues. We fail to see the purpose to be served, however, in a lengthy delay of FPC action in this urgent matter pending arbitration when the FPC, even under Gulf's view, would ultimately be free to ignore completely the arbitration results. Deferral to arbitration under these circumstances would unnecessarily expend previous time, effort, and money.
 
 
 44
 For these reasons, we will affirm the refusal of the FPC to defer to arbitration.
 
 IV. COMMERCIAL IMPRACTICABILITY
 
 45
 Gulf contends that the contract is limited to the gas which it is commercially practicable to deliver. As part of this argument, Gulf insists that the contract as a whole evidences the intention of the parties to deal only with gas found in the southern Louisiana area in which Delta Block 27 is located. Gulf also maintains that even if its delivery obligations are unconditional on the face of the contract, the Commission's order that Gulf perform the contractual deliveries is erroneous under two principles of law:[10] (1) even facially unconditional obligations are subject to economic limitations; and (2) "(w)here performance has been rendered impracticable, even though not impossible, and such impracticability was the result of unforeseen events, as here, a party will be excused from performance."
 
 
 46
 The first question to be resolved is whether the contract itself limits the sources of gas to the southern Louisiana area. Gulf points to the specific reference in the preamble of the contract to southern Louisiana and to the provision in Article III that delivery will take place in Plaquemines Parish, Louisiana, close to Delta Block 27. Gulf's interpretation of the contract, however, is inconsistent with the single most important provision of the contract the provision by which Gulf "warrants" the delivery of the contract quantities of gas without regard to service. The importance of this provision is underscored by the history of the contract. Thus, although Gulf could have dedicated to the contract the specific gas producing lease of West Delta Block 27, Gulf purposefully chose not to do so. As Gulf emphasized in its application for the certificate of public convenience,
 
 
 47
 (T)he agreement with Texas Eastern does not commit or dedicate to the contract any specific gas producing leases or fields, and no specific commitment or dedication is intended.
 
 
 48
 Gulf itself reiterated its understanding of the contract in its 1971 application for an amendment to the certificate:
 
 
 49
 The Gas Purchase Contract is what is known as a warranty contract which does not involve the dedication of specific leases to the performance of the agreement but warrants delivery of a stated volume at a specified rate per day.
 
 
 50
 Furthermore, the FPC's finding and order accompanying the issuance of the certificate require that we not interpret the contract as limited to gas from West Delta Block 27. The Commission, although recognizing that Gulf expected to draw most of the gas from Delta Block 27, noted that "Gulf further indicated that it had additional gas available to fulfill the overall contractual requirement." By accepting the certificate which was based on this finding, Gulf became bound by the Commission's interpretation. Cf. Sunray Mid-Continent Oil Co. v. FPC, supra, 364 U.S. at 156, 80 S.Ct. 1392; Atlantic Refining Co. v. PSC of New York, 360 U.S. 378, 389, 79 S.Ct. 1246, 3 L.Ed.2d 1312 (1959).
 
 
 51
 Against this overwhelming evidence that Gulf intended to warrant the deliveries of contract quantities without regard to source and that the certificate is predicated on that warranty, Gulf relies only upon the reference in the preamble to southern Louisiana and the delivery point provision of Article III. In our view, these references are a slender reed on which to rest and neither they nor other aspects of the contract support Gulf's position.
 
 
 52
 First, a recital in a preamble, although part of the contract, must give way in case of conflict with the operative provisions of a contract. Fidelity Bank v. Lutheran Mutual Life Ins. Co., 465 F.2d 211, 214 (10th Cir. 1972); Kogod v. Stanley Co. of America, 88 U.S.App.D.C. 112, 114, 186 F.2d 763, 765 (1950). Thus, although we perceive no conflict between the recital of gas reserves in southern Louisiana and the warranty of deliveries regardless of source, a conflict, if any, must be resolved in favor of the warranty. Secondly, the provision for delivery at a point near the area from which Gulf concededly anticipated it would draw most of the gas is hardly very remarkable and proves very little. Even without the warranty provision, we would not interpret language which purports to do no more than establish a delivery point as actually creating an implied condition on the seller's entire obligation to perform. In the context of this warranty contract, of course, such an interpretation is impossible. We conclude, therefore, that the contract on its face obligates Gulf to deliver the specified contract quantities of gas regardless of where the gas is drawn.
 
 
 53
 The next question is whether Gulf's delivery obligation, although unconditional on the face of the contract, is subject to economic limitations. Gulf cites Dillon v. United States, 156 F.Supp. 719, 722, 140 Ct.Cl. 508 (1975), holding that contract to deliver hay at Ft. Reno, Oklahoma, which the parties contemplated would be grown in nearby Vinita, Oklahoma, did not obligate the seller to purchase hay in Nebraska and ship it to Oklahoma at his expense, and Mitchell Canneries, Inc. v. United States, 77 F.Supp. 498, 502, 111 Ct.Cl. 228 (1948), reaching a similar result with respect to blackberries not available where contemplated due to a crop failure.
 
 
 54
 Reliance on these cases is misplaced for three reasons: First, and most important, neither case involves a warranty contract. Second, in both cases the sellers were relieved of their delivery obligations only upon a showing of extreme hardship, whereas Gulf has shown no particular hardship at all in the instant case, as we discuss below. Third, in both Dillon and Mitchell Canneries, the extreme economic hardship to the sellers resulted from forces of nature clearly beyond the sellers' control, not an error on the part of the sellers in estimating their supplies. We, therefore, do not believe that Gulf's obligation can be excused by analogy to either Dillon or Mitchell Canneries.
 
 
 55
 Finally, we turn to Gulf's argument that its performance is excused by the doctrine of commercial impracticability. In support of this contention, Gulf cites a number of cases which hold that if, due to unforeseen circumstances, the cost of performance of a contract becomes so excessive and unreasonable as to make performance impracticable, performance may be excused. See, e. g., Mineral Park Land Co. v. Howard, 172 Cal. 289, 156 P. 458 (1916); Carozza v. Williams, 190 Md. 143, 57 A.2d 782 (Ct.App.1948); Cosden Oil & Gas Co. v. Moss, 131 Okla. 49, 267 P. 855 (1928). Relying on these authorities, Gulf asserts that "(N)o one entertained the thought that Gulf would be required to deliver gas from far off places at unknown but obviously 'exorbitant' costs." We do not dispute Gulf's statement of the legal doctrine, only its application to this case.
 
 
 56
 We believe, first of all, that a warranty by its very nature precludes relief on a theory of commercial impracticability resulting from the unavailability of gas.
 
 
 57
 In essence a warranty is an assurance by one party to an agreement of the existence of a fact upon which the other party may rely; it is intended precisely to relieve the promisee of any duty to ascertain the facts for himself. Thus, a warranty amounts to a promise to indemnify the promisee for any loss if the fact warranted proves untrue.
 
 
 58
 Paccon, Inc. v. United States, 399 F.2d 162, 166-67, 185 Ct.Cl. 24 (1968), quoting Dale Constr. Co. v. United States, 168 Ct.Cl. 692, 699 (1964). Accord, Metropolitan Coal Co. v. Howard, 155 F.2d 780, 784 (2d Cir. 1946) (L. Hand, J.); The Fred Smartley, Jr., 108 F.2d 603, 606-07 (4th Cir. 1940). Gulf's warranty "that there will be provided . . . a quantity of gas sufficient to enable Seller to have available for delivery (the contract quantities of gas)" whether it is a warranty of fact or of performance, is subject to the same rule: By warranting, rather than merely promising, the availability of sufficient quantities of gas, Gulf assumed for itself the entire risk that future conditions would raise the cost of gas. As the Restatement says,
 
 
 59
 Since it is possible for a party to contract to assume the risk of every chance occurrence, a fair interpretation of a contract may indicate an intention to be bound to perform or to pay damages for nonperformance whatever contingencies occur.
 
 
 60
 Restatement of Contracts, § 288, comment b at 427 (1932). Gulf's warranty indicates just such an intention to be bound. The defense of impracticability is inconsistent with an express warranty, Chemetron Corp. v. McLouth Steel Corp., 381 F.Supp. 245, 257 (N.D.Ill.1974), aff'd 522 F.2d 469 (7th Cir. 1975); cf. United States v. Hathaway, 242 F.2d 897, 899-901 (9th Cir. 1957), and Gulf may not avoid its obligations because one of the risks which it assumed has now become real.
 
 
 61
 We also believe that even in the absence of an express and unconditional warranty, the doctrine of commercial impracticability would not apply to this case. The crucial question in applying that doctrine to any given situation is whether the cost of performance has in fact become so excessive and unreasonable that the failure to excuse performance would result in grave injustice:
 
 
 62
 We do not mean to intimate that the defendants could excuse themselves by showing the existence of conditions which would make the performance of their obligation more expensive than they had anticipated, or which would entail a loss upon them.
 
 
 63
 Mineral Park Land Co., supra, 172 Cal. at 293, 156 P. at 460. The party seeking to excuse his performance must not only show that he can perform only at a loss but also that the loss will be especially severe and unreasonable. See American Trading & Production Corp. v. Shell Int'l Marine Ltd., 453 F.2d 939, 942 (2d Cir. 1972); Uniform Commercial Code § 2-615, Comment 4. Gulf has made no such showing.
 
 
 64
 While repeatedly asserting that the cost of delivering the contract quantities of gas would be "exorbitant," Gulf's briefs are curiously devoid of citation to supporting evidence in the record. Nor have we been able to discover any such evidence ourselves. What we do find in the record is an uncontradicted Price-Waterhouse Report commissioned by Gulf for Gulf's confidential use which projects a net profit to Gulf of $190,000,000 on the Texas Eastern Contract even if Gulf is required to fulfill its warranty obligations. At the very least, the evidence in the record suggests that although Gulf may realize smaller profits than originally anticipated, it will probably suffer no loss, and certainly not a severe and devastating loss. The commercial impracticability doctrine is thus completely inapplicable to the instant case. We find no error in the FPC's decision on this issue.[11]
 
 V. MISTAKE
 
 65
 Gulf contends that it is entitled to partial relief from its delivery obligations on the basis of the mistake it made in estimating the gas reserves of Delta Block 27. Gulf evidently relies on the well known doctrine that a mutual mistake as to a material fact will relieve a party to a contract of his obligation to perform.[12] We agree with the Commission that Gulf is entitled to no relief on this ground.
 
 
 66
 We must stress once again that the contract here at issue contains an express and unconditional warranty. For reasons best known to Gulf itself, Gulf chose not to base this contract on the actual reserves of Delta Block 27 by dedicating its gas leasehold for that field to this contract.[13] Instead, Gulf warranted the availability of the contract quantities of gas in the expectation of obtaining the bulk of it from Delta Block 27 despite the inherent uncertainty of the quantities ultimately available in the Block.[14] We believe that the existence of a warranty as to the availability of gas completely forecloses equitable relief based on a mistake as to the availability of gas.
 
 
 67
 The warranty in this case is analogous to a warranty deed. As Professor Corbin says, "A seller of land or goods who conveys by warranty deed, or who otherwise expressly warrants title or quality or condition, does not escape from his warrant by proving that he reasonably believed that defects did not exist. Even though he was not conscious that there was risk, he was at least aware of the extent of his express warranty." 3 Corbin on Contracts § 598 at 591-92 (1960) (footnote omitted). Accord, 6 S. Williston and G. Thompson, Williston on Contracts § 1934 at 5417 (rev. ed. 1938).[15] Having warranted the availability of 625,000 MCF of natural gas per day, Gulf may not now assert a defense of mistake.[16] We will affirm the Commission's decision on this issue.
 
 VI. FORCE MAJEURE
 
 68
 Gulf argues that it is excused from delivery of the full 625,000 MCF per day under the terms of the force majeure clause of the contract. In Gulf's view, the failure of the Department of Interior to hold more than two general offshore Louisiana lease sales between 1962 and 1972 constituted an act of force majeure within the meaning of the contract. Specifically, Gulf points to this language in the force majeure clause:
 
 
 69
 (The term "force majeure") shall . . . include (a) in those instances where either party hereto is required to obtain servitudes, rights of way grants, permits or licenses to enable such party to fulfill its obligations hereunder, the inability of such party to acquire . . . at reasonable cost and after the exercise of reasonable diligence, such servitudes, rights of way grants, permits or licenses . . . .
 
 
 70
 Gulf contends that because an offshore gas lease is a "servitude" under Louisiana law, State ex rel. Bush v. United Gas Public Service Co., 185 La. 496, 169 So. 523 (1936); Arent v. Hunter, 171 La. 1059, 133 So. 157 (1931), Gulf's inability to acquire offshore leases falls within this definition of force majeure.
 
 
 71
 Alternatively, Gulf contends that even if the doctrine of ejusdem generis indicates that "servitudes," together with "rights of way grants, permits or licenses," is intended to refer only to easements necessary for construction of production or transportation facilities, the failure to sanction offshore leases comes within another part of the contract definition of force majeure : "any other causes, whether of the kind herein enumerated or otherwise, not within the control of the party claiming suspension." (Emphasis supplied.) Gulf's argument, however, requires that we completely ignore the determinative proviso of the force majeure clause:
 
 
 72
 . . . provided, further, that in no event shall (the) term ("force majeure") mean or include partial or entire failure or depletion of gas reserves or sources of supply of gas.
 
 
 73
 We must give effect to this specific provision rather than to the more general language on which Gulf relies. See, e. g., Capitol Bus Lines Co. v. Blue Bird Coach Lines, Inc., 478 F.2d 556, 560 (3d Cir. 1973).
 
 
 74
 In an effort to avoid the clear exclusion from the force majeure clause of "failure . . . of gas reserves or sources of supply of gas," Gulf argues in its reply brief that gas leases must first be acquired before they can "fail," and that it is the inability to acquire leases in the first place, not the failure of the leases, which forms the basis for Gulf's force majeure argument. Gulf's argument in this respect, however, is somewhat disingenuous. In every other part of its brief and at oral argument, Gulf made clear that its alleged inability to perform its certificate obligation was attributable to Gulf's overestimate of the amount of gas in West Delta Block 27. It was the "partial or entire failure or depletion" of the Block 27 "reserves or sources of supply of gas" which led to do Gulf's underdeliveries. In its force majeure argument, on the other hand, Gulf discovers that it was its inability to acquire offshore leases rather than its mistaken estimate of the Block 27 reserves which brought about the reduced deliveries. The fact is, however, that Gulf's greatly increased need for offshore leases was brought about by the mistaken estimate of the Block 27 reserves, a mistake which is specifically excluded from the force majeure clause.
 
 
 75
 The clear inapplicability of the force majeure clause to the underdeliveries here is made even plainer when it is considered in the context of the entire contract. As we have discussed above, Gulf chose to warrant its delivery of the full contract quantity, rather than conditioning that delivery on the availability of sufficient gas reserves. The notion that the unavailability of gas could serve to excuse performance is inconsistent with the essence of a warranty contract and the force majeure clause cannot serve to excuse Gulf's breach of warranty. We will, therefore, affirm the FPC's determination that Gulf's performance of its certificate obligations was not excused in whole or in part by force majeure within the meaning of the contract.
 
 VII. RES JUDICATA
 
 76
 Gulf next contends that the Commission's decisions in Opinions No. 780 and No. 780-A the decisions which are now under review are tainted by the Commission's unwarranted reliance on its prior decisions in Opinions No. 692 and No. 692-A. In Opinions Nos. 692 and 692-A, in response to Gulf's application for an amendment to its certificate, the Commission determined that Gulf's delivery obligations were unconditional and not excused by commercial impracticability, mistake, or force majeure consisting of the Interior Department's failure to sanction offshore leases. Gulf took no appeal from the Commission's decision in Nos. 692 and 692-A.
 
 
 77
 Although Gulf characterizes the Commission's alleged recent reliance on Nos. 692 and 692-A as a misapplication of the doctrine of res judicata, we believe that Gulf is in fact referring to the doctrine of collateral estoppel. Res judicata applies only where a second suit or proceeding is brought on the same cause of action between the same parties or those in privity with them. The original judgment on the merits is conclusive not only as to matters actually raised but also as to matters which could have been raised and litigated. Murphy v. Landsburg, 490 F.2d 319, 322 (3d Cir. 1973). Collateral estoppel is more limited in its effect; collateral estoppel forecloses a party from relitigating the same question decided adversely to him by a prior judgment on another cause of action; the conclusive effect of the prior adjudication constitutes an estoppel only with respect to the identical issues actually litigated and necessary to support the initial judgment. Donegal Steel Foundry Co. v. Accurate Products Company, 516 F.2d 583 (3d Cir. 1975). Since Nos. 692 and 692-A involved an application by Gulf for a certificate amendment and the present proceedings concern a show cause order issued by the Commission to enforce Gulf's certificate obligations, we believe that collateral estoppel is the correct principle to be considered.
 
 
 78
 The first question presented by Gulf's collateral estoppel argument is whether the Commission's decision in the case now under review was in fact made in reliance on its prior decision in Nos. 692 and 692-A. New England, one of the intervenors, denies any such reliance on the part of the Commission, but we disagree. In Opinion No. 780, the Commission said this:
 
 
 79
 But we do not rest the present opinion and order in this show cause proceeding solely on statements in Opinions Nos. 692 and 692-A but on our reexamination of the contract and the record in this case.
 
 
 80
 (Emphasis supplied.) Opinion No. 780-A contains a substantially identical statement. In view of this language, we recognize that one basis for the Commission's conclusion was its prior determination. On the other hand, the opinions of the Administrative Law Judge and the Commission in the present proceeding, as well as the voluminous record which was assembled, demonstrate that the Commission did in fact both thoroughly reexamine the entire record and fully reconsider each of Gulf's arguments with respect to commercial impracticability, mistake, and force majeure. Thus, the Commission's determination on these issues rests on what are essentially alternative holdings, one based on giving collateral estoppel effect to Opinion Nos. 692 and 692-A and the other on a complete reconsideration on the merits in the instant case.
 
 
 81
 We have held in Parts IV, V and VI, supra, that Gulf's arguments on the issues of commercial impracticability, mistake, and force majeure are without merit. Even if Gulf is correct in its contention that the Commission's determination on these issues placed improper reliance on Opinion Nos. 692 and 692-A,[17] the existence of an independent and meritorious ground in support of the Commission's decision renders harmless any error the Commission may have made in its application of the doctrine of collateral estoppel.
 
 VIII. REFUNDS
 
 82
 The Commission ordered Gulf to refund to Texas Eastern for distribution to Texas Eastern's customers a sum equal to "the difference between Texas Eastern's requests for gas and Gulf's deliveries (multiplied by) the difference between the contract price and the otherwise applicable area or national rates" and interest. The refunds are to be paid both for Gulf's past defaults as well as for any occasion in the future in which Gulf again defaults on its delivery obligation. Coupled with the refund provision is a recoupment order as follows:[18]
 
 
 83
 In the Commission's opinion fairness to the consumers demands that where Gulf has defaulted on its undertaking to supply gas at a given price, Gulf should make payments in order to leave Texas Eastern and the consumers in approximately the same economic position they would have been if they received the gas.
 
 
 84
 Texas Eastern argues that provision for refunds would prevent it from receiving the amount of the undelivered gas. That is not our intention. The refund is designed to compensate Texas Eastern and its customers for Gulf's failure to make full deliveries in the past. The contract amount of 4.4 Tcf remains in effect. However, it is correct that delivery of 4.4 Tcf at the contract price, and payment of refunds would mean that Gulf was not receiving the compensation to which it was entitled. At the same time, Gulf's default has caused present damage which requires relief. Therefore, we shall provide that when Gulf has delivered an amount of gas equivalent to the contract amount less the amounts of gas for which it has paid refunds, Gulf shall be permitted to charge the contract price plus the amount of the refunds previously paid on an equivalent amount of gas.
 
 
 85
 A hypothetical example may clarify our decision. Assume it were found that before Gulf resumed satisfaction of its contract obligations it had defaulted in the following amounts:
 
 
 86
 Then Gulf would be required to refund immediately, plus appropriate interest, $89.6 million. Then, when it had delivered all but 300 Bcf of the contract amount, it would be permitted to recoup its refunds by adding a surcharge of 7cents/Mcf to the next 90 Bcf sold, 23cents/Mcf to the next 40 Bcf, etc., until the entire contract was fulfilled, and the entire refund recouped.
 
 
 87
 Over the entire contract, Gulf would have received exactly the contract price for all 4.4 Tcf, but it would, in effect, have been required to lose the time value of its money required to compensate its customers for their losses due to Gulf's non-delivery in accordance with the terms of the contract.
 
 
 88
 Gulf argues that the Commission lacks statutory authority to order any refunds at all[19] while New England contends that the Commission erred in coupling to the refund order the procedure for recoupment. Without attempting to catalogue all the situations in which the Commission may appropriately order refunds, we hold that the refund-recoupment order here under review falls within the Commission's statutory power.
 
 A. FPC Power to Order Refunds
 
 89
 The starting point for our analysis is section 7(c) of the Natural Gas Act, 15 U.S.C. § 717f(c):[20](c) No natural-gas company . . . shall engage in the . . . sale of natural gas, subject to the jurisdiction of the Commission . . . unless there is in force with respect to such natural-gas company a certificate of public convenience and necessity issued by the Commission authorizing such acts or operations . . . .
 
 
 90
 (Emphasis supplied.) The Commission found that Gulf violated section 7(c), holding in essence that since Gulf's certificate authorized daily deliveries of 625,000 MCF on demand by Texas Eastern and not deliveries in some lesser amount, Gulf's underdeliveries constituted a sale of natural gas as to which there was no certificate in force. Although there appears to be no precedent for an application of section 7(c) to an underdelivery under a certificate of public convenience, neither has Gulf cited any authority against it, nor any sufficient reason, so far as we can see, to read the section otherwise. Gulf does not contest the Commission's authority in an appropriate case to order a producer to comply with the terms of its certificate and the source of that authority must be section 7(c) combined with sections 7(a) and 7(e).[21]
 
 
 91
 The next question is whether the Commission's refund-recoupment order is an appropriate remedy for the violation by Gulf of section 7(c) and of the terms of its certificate. In order to affirm the order, we need find only that it is appropriate, not that it is the only appropriate or most appropriate remedy which might have been devised. "Once the existence of a rational basis for the Commission's action is ascertained the reviewing power is estopped from further consideration of the Commission's action." Southern California Edison Co. v. FPC, 387 F.2d 619, 621 (3d Cir. 1967), cert. denied, 392 U.S. 909, 88 S.Ct. 2055, 20 L.Ed.2d 1367 (1968). See also Mesa Petroleum Co. v. FPC,441 F.2d 182, 189 (5th Cir. 1971).
 
 
 92
 The scope of the Commission's remedial powers is defined by section 16 of the Act, 15 U.S.C. § 717o :
 
 
 93
 Sec. 16. The Commission shall have the power to perform any and all acts and to prescribe, issue, make, amend, and rescind such orders, rules, and regulations as it may find necessary or appropriate to carry out the provisions of this chapter.
 
 
 94
 In the view of the Commission, section 16 may be analogized to the necessary and proper clause of the Constitution: once a matter has been found to be a proper subject of Commission concern, section 16 empowers the Commission to exercise wide discretion in selecting the tools with which to safeguard the public interest in matters relating to the transportation and sale of natural gas. Gulf submits, however, that section 16 does no more than implement "authority otherwise conferred upon the Commission." (Emphasis in Gulf's brief.) Finding nothing in section 7(c) (or elsewhere in the Act) which authorizes the Commission to award refunds in the case of an underdelivery, Gulf concludes that the refund-recoupment order cannot be predicated upon section 16.
 
 
 95
 The leading case in support of the Commission's position is Mesa Petroleum Corp. v. FPC, supra. Hugoton Production Co., a gas producer, held a certificate of public convenience and necessity for the sale of gas to Panhandle Eastern Pipe Line Co. Without receiving Commission approval, Hugoton terminated its deliveries to Panhandle and at a later date, Hugoton applied to the Commission for permission to abandon those deliveries nunc pro tunc. The Commission determined that no abandonment should be permitted, and it ordered Hugoton to refund to Panhandle the difference between what it actually paid and what it would have paid for the gas had there been no abandonment. Mesa Petroleum Co., successor in interest to Hugoton, petitioned the Fifth Circuit for review and raised the following question:
 
 
 96
 Does the Natural Gas Act (the Act) empower the Commission to make an award of "damages" to a pipeline company or its customers for injuries allegedly resulting from the producer's termination of deliveries to the pipeline?
 
 
 97
 441 F.2d at 186.
 
 
 98
 The Fifth Circuit began its analysis by recognizing that the Commission's primary responsibility under the Natural Gas Act is to the consumer. E. g., California Gas Producers Ass'n v. FPC, 421 F.2d 422, 428 (9th Cir. 1970). The Mesa court then construed section 16 as a grant of remedial power to the Commission which, in keeping with the Commission's duty to serve the public interest, could not be limited to the express remedies provided by other sections of the Act. The Mesa court relied on the expansive construction given section 309 of the Federal Power Act, 16 U.S.C. § 825h (1970) employing identical language to section 16 of the Natural Gas Act in Niagara Mohawk Power Corp. v. FPC, 126 U.S.App.D.C. 376, 381, 379 F.2d 153, 158 (1967):
 
 
 99
 While such "necessary and appropriate" provisions do not have the same majesty and breadth in statutes as in a constitution, there is no dearth of decisions making clear that they are not restricted to procedural minutiae, that they authorize an agency to use means of regulation not spelled out in detail, provided the agency's action conforms with the purposes and policies of Congress and does not contravene any terms of the Act.
 
 
 100
 Quoted in Mesa, 441 F.2d at 187. Again quoting Niagara Mohawk, 126 U.S.App.D.C. at 382, 379 F.2d at 159, the Mesa court opined that "the breadth of agency discretion is . . . at its zenith when the action assailed relates primarily . . . to the fashioning of policies, remedies, and sanctions . . . in order to arrive at maximum effectuation of Congressional objectives." Mesa, 441 F.2d at 187-88. This view of the Commission's section 16 power together with the Commission's enforcement of a specific provision of section 7(b) provided sufficient answer, in the view of the Fifth Circuit, to the contention that the refund order was unlawful.[22] 441 F.2d at 188-89.
 
 
 101
 Gulf suggests that Mesa must be distinguished from the instant case. In Mesa, Gulf points out, the Commission had found a section 7(b) violation based on the gas producer's failure to secure Commission approval of its cutback in service whereas the instant case involves only a section 7(c) violation. Moreover, Gulf maintains, Mesa was also based to some degree on the gas producer's refusal to follow FPC prescribed procedures generally. We do not agree that these factors provide any meaningful distinction.
 
 
 102
 First, although it is true that the Commission did not address the question whether Gulf has violated section 7(b),[23] the circumstances of this case are not in reality very different from those in Mesa ; like Hugoton, Gulf has terminated part of its certificated service without the approval of the Commission. That the termination in Mesa was treated as a violation of section 7(b) and here as a violation of the certificate and of section 7(c) does not diminish the FPC's remedial powers. Secondly, nothing in Mesa supports Gulf's theory that the decision was predicated on the wrongfulness of the producer's conduct rather than the appropriateness of refunds to remedy any violation of the Act which has resulted in consumer injury. Thus, we perceive no meaningful distinction between this case and Mesa. Our inability to distinguish Mesa does not mean, however, that we must necessarily follow the Mesa decision. Authority from other circuits teaches that section 16 has a more narrow scope than that which the Mesa court gave it.
 
 
 103
 Gulf cites a number of cases which generally lend credence to its position that section 16 exists only to implement authority otherwise conferred upon the Commission.[24] The best statement of this position is found in Mobil Oil Corp. v. FPC, 157 U.S.App.D.C. 235, 483 F.2d 1238, 1257 (1973):
 
 
 104
 The substantive provisions of the Act contemplate certain procedures as incident to the functions provided. The range of permissible procedures must be derived from these sections, sections like sections 4 and 5 of the Natural Gas Act, and the functions they describe. Section 16, which uses a broad generality of "necessary and appropriate" that is not rooted in a function, cannot enlarge the choice of permissible procedures beyond those that may fairly be implied from the substantive sections and the functions there defined.
 
 
 105
 While it is true, as the FPC argues, that Mobil Oil concerned an attempt by the FPC to use section 16 to dispense with procedures mandated by the Act, the quoted language of Mobil Oil suggests that the District of Columbia Circuit would not sanction the expansive reading of section 16 which the Fifth Circuit approved in Mesa. But cf. United States Steel Corp. v. FPC, 533 F.2d 1217, 1222-23 (D.C.Cir. 1976). We think that the interpretations of section 16 in Mesa and Mobil Oil are irreconcilable.
 
 
 106
 We find the approach taken by the Mesa court to be the more persuasive of the two, at least for the purposes of this case, although we need not go as far as the Mesa court did. Our concern in this case is with a procedure which will ultimately result in a loss to Gulf of nothing more than the time value of the money: If Gulf fully complies in the future with its delivery obligations, it will recoup every dollar that it has been ordered to refund. The refund-recoupment order is an efficient, fair, and reasonable exercise of discretion to compel compliance with section 7(c) of the Natural Gas Act. It is neither analogous to damages, reparations, nor penalties since Texas Eastern's customers ultimately will be required to repay all the money obtained under the refund order. The order is, in our view, nothing more than a temporary performance bond made necessary by Gulf's failure to fulfill the terms of its certificate. Viewed in this light, the Commission's refund-recoupment order can be sustained without reading section 16 as broadly as Mesa does. To affirm the Commission, we need only find that section 16, if it does nothing else, at least gives the Commission power to take reasonable, temporary measures to assure compliance with its orders.
 
 
 107
 We believe that a natural and commonsense reading of section 16 allows the Commission this latitude. The statutory authority of the Commission to "carry out the provisions of (the Act)," set forth in section 16, and to perform "any and all acts, and to . . . issue . . . such orders . . . as it may find necessary or appropriate" implies the necessary power to achieve compliance in the public interest with the Commission's lawful orders.
 
 
 108
 We do not mean to imply that every refund-recoupment order is entitled to a per se affirmation. Any such order must have a "rational basis," Southern California Edison, supra, 387 F.2d at 621, and may be set aside if arbitrary, capricious or an abuse of discretion. 5 U.S.C. § 706(2)(A). We believe that the Commission's refund-recoupment order in the instant case, however, meets these standards.
 
 
 109
 The FPC was confronted in this case with a massive default on the part of Gulf, a blatant breach of the warranty on the basis of which Gulf was awarded its certificate. In Opinion Nos. 692 and 692-A, the Commission had made clear to Gulf its determination that Gulf's obligation was unconditional and that no change in circumstances resulting from Gulf's mistaken reserves estimate would excuse Gulf from delivery of the full 625,000 MCF per day, yet Gulf had neither petitioned for review of that decision nor taken steps to meet its delivery obligations. In short, the Commission was justified in believing that Gulf needed a reasonable, external prod to ensure its compliance with the Commission's order.[25]
 
 
 110
 The refund-recoupment order also serves two other important purposes. First, by requiring that Gulf pay a refund on every occasion in the future that it underdelivers, the order discourages non-compliance. Second, by reducing the profits Gulf achieved by its past derelictions, Gulf and other gas producers are put on notice that nothing is to be gained by failing to timely comply with their certificates of public convenience.
 
 
 111
 Given the circumstances of this case and the sound purposes and public interest to be served by the refund-recoupment order in protecting consumers with an adequate supply of natural gas at just and reasonable rates, Sunray Mid-Continent Oil Co. v. FPC, 364 U.S. 137, 80 S.Ct. 1392, 4 L.Ed.2d 1623 (1960), we hold that the refund-recoupment order has a rational basis and is neither arbitrary nor capricious, nor an abuse of the Commission's discretion.
 
 B. Recoupment
 
 112
 New England petitions us to set aside the Commission's recoupment order while leaving intact the order of refunds. We cannot do so, not because we believe that every refund order must be complemented by a provision for recoupment we need not decide that question in this case but because of a fundamental flaw in New England's argument.
 
 
 113
 New England does not contend that the Commission was obligated to order refunds, nor does any authority with which we are familiar hold that the Commission is ever required to supplement an order enforcing performance of certificate obligations with a provision for refunds. Since there is no obligation to order any refunds, there can be no abuse of discretion in the Commission's refusal to order irrecoverabe refunds in effect, penalties assuming, without deciding, that the Commission would be legally empowered to do so. We cannot fault the Commission for ordering the recoupment of funds when it was under no mandate to order their refund in the first place. We will, therefore, affirm the provisions for recoupment in the Commission's order.
 
 C. The Refund Formula
 
 114
 Gulf contends that even if the Commission is empowered to order refunds, the formula by which these refunds are calculated is erroneous. The Commission's formula is based on the difference between the contract rate and the prevailing area or national rates set by the Commission from time to time,[26] Gulf believes that the refund formula should instead be based on the difference between the contract rates and the actual rates at which Texas Eastern procured replacement gas. The Commission had this to say on the refund formula:
 
 
 115
 In our opinion, the staff's formula, based upon the applicable area or national rate, should be followed in the present situation where expeditious relief is desirable. Conditioning relief on actual proof of the myriad affects (sic) of Gulf's non-delivery could lead to endless proceedings. Staff's suggested measure of payment is an equitable estimate of damage to the customers.
 
 
 116
 We find no abuse of discretion in the refund formula. In addition to the Commission's rationale, which we find persuasive, we have considered two other factors. The first is the nature of the refund-recoupment order of which the formula is a part. That order is not intended as a measure of damages but as a method of enforcing compliance with the certificate; the refund is recoverable upon satisfaction of the delivery obligations. Thus, the dispute over the formula is comparable to a dispute over the amount of a security bond. In the case of such a bond, the amount fixed by the district court will not be disturbed absent an abuse of discretion, see, e. g., Stockslager v. Carroll Elec. Co-op Corp., 528 F.2d 949 (8th Cir. 1976); Lektro-Vend Corp. v. Vendo Co., 403 F.Supp. 527 (N.D.Ill.1975) aff'd, 545 F.2d 1050 (7th Cir. 1976), rev'd on other grounds, --- U.S. ----, 97 S.Ct. 2881, 53 L.Ed.2d 1009 (1977), and we believe the same standard should pertain here. We cannot say that the Commission's formula is so unreasonable as to constitute such an abuse of discretion. Second, Gulf's assertion that the actual replacement rates were lower than the FPC prescribed area or national rates is not supported by any citation to the record. In the absence of any evidence that the rates differed, we cannot say that the Commission's choice of area or national rates constituted an abuse of discretion. Accordingly, we will affirm the Commission's refund formula.
 
 D. Interest
 
 117
 We will also affirm the Commission's order that the refunds include a component of interest, designed to compensate the customers of Texas Eastern for the loss of the time value of the additional money they paid for natural gas due to Gulf's default. As we read the Commission's order, Gulf will recoup the interest component of the refunds together with the portion representing the difference in rates. The interest is thus just one part of the refund-recoupment scheme and the dispute over interest is nothing more than another aspect of the dispute concerning the amount of the bond to be required of Gulf. As such, the Commission's determination is reviewable only for abuse of discretion, and we find no abuse in the interest aspect of the Commission's refund order. We also see no merit in Gulf's contention that under 28 U.S.C. § 1961 the interest can only run, if at all, from October 15, 1976, the date on which Opinion No. 780 was issued. Section 1961 applies by its terms only to civil cases in the United States district courts. Accordingly, we will affirm the inclusion of interest in the refund order.[27]
 
 IX. INTRASTATE SALES
 
 118
 The Commission ordered Gulf to file with it all contracts for the intrastate sale of natural gas.
 
 
 119
 "In view of Gulf's failure in recent years to comply with the delivery requirements of the certificate issued to it, we believe it important for us to review any future intrastate sales proposed by Gulf to ascertain whether such gas should be sold by Gulf to Texas Eastern under the subject certificate. Accordingly, we shall require Gulf to file with the Commission all contracts for the sale of gas in intrastate commerce made after the date of this order.
 
 
 120
 Gulf objects not to the request for information per se but to the implication which Gulf discerns in the Commission's opinions that the Commission might in the future attempt to regulate intrastate sales which are beyond its jurisdiction under section 1(b) of the Act, 15 U.S.C. § 717(b).
 
 
 121
 In Opinion No. 780-A, responding to this contention by Gulf, the Commission stated that it is "now only asking for information of intrastate sales." As Gulf concedes, the collection of such data is not improper, Continental Oil Co. v. FPC, 519 F.2d 31 (5th Cir.), cert. denied, 425 U.S. 971, 96 S.Ct. 2168, 48 L.Ed.2d 794 (1976), and we will, therefore, affirm this aspect of the Commission's order. Only if and when the Commission attempts actually to regulate Gulf's intrastate sales will the question of the Commission's authority to do so become ripe for decision.
 
 X. CONGRESSIONAL INTERFERENCE
 
 122
 Gulf contends that members and staff of the Commission were subjected to improper interrogation and interference regarding their decision of this case by the Subcommittee on Oversight and Investigation and the Subcommittee on Energy and Power of the House Committee on Interstate and Foreign Commerce. Citing Pillsbury v. FTC, 354 F.2d 952 (5th Cir. 1966), and D.C. Federation of Civic Associations v. Volpe, 148 U.S.App.D.C. 207, 459 F.2d 1231 (1972), Gulf submits that the pervasive infection of the Commission's decision resulting from the Congressional interference can be cured only by our setting aside the Commission's order in its entirety. The FPC responds by denying both the existence of any improper Congressional interference and the applicability of Pillsbury and D.C. Federation. Having carefully considered the transcripts of the subcommittee hearings and the correspondence between the subcommittee and the Commission, we conclude that the Commission order should not be set aside on this basis.
 
 
 123
 We agree, of course, with the principle underlying Pillsbury : The courts must not tolerate undue legislative interference with an administrative agency's adjudicative functions. We also are sensitive to the legislative importance of Congressional committees on oversight and investigation and recognize that their interest in the objective and efficient operation of regulatory agencies serves a legitimate and wholesome function with which we should not lightly interfere. We do not believe, however, that the extent and nature of the Congressional involvement in the FPC's conduct of this case warrants reversal of the Commission's order. The record shows that the subcommittee's interest in this case, although substantial, was directed at accelerating the disposition and enforcement of the FPC's compliance procedures. It was avowedly directed not at the FPC's decision on the merits but at the Commission's determination to conduct a lengthy show cause hearing rather than to seek immediate injunctive relief in the federal district court.[28]
 
 
 124
 Although the Committee expressed its concern because of the delay of the Commission in enforcing its order and the obligations of the certificate holders, including Gulf specifically, the record, in contrast to Pillsbury, supra, does not disclose a "searching examination as to how and why (the FTC) reached (a) decision in a case still pending . . . and to criticize (the Commission) for reaching the 'wrong decision.' " Pillsbury v. FTC, 354 F.2d at 964. Nor does it reveal any effort to influence the Commission in reaching any decision on the specific facts of the case. Any intrusion by subcommittee members into the Commission's actual decisional process concerning the merits of the show cause proceeding, see Pillsbury, 354 F.2d at 964, was only incidental to the purpose of accelerating the FPC's disposition of the case.
 
 
 125
 We are persuaded that these incidental intrusions by two or three members[29] into the FPC's decision process did not seriously influence the Commission. First, it is not clear that the interrogation of a few members reflected the view of the majority of the subcommittee, not to mention the full committee or the Congress. Secondly, the obvious fact that the Commission doggedly refused to abandon the show cause proceeding despite the considerable pressure upon it to go to court is persuasive that the Commission was fully capable of withstanding incidental efforts, if any, by subcommittee members to influence its decision on the merits of the case. Thirdly, the Commission's prior decision in Opinion Nos. 692 and 692-A on April 19, 1974, more than a year before the subcommittee hearings, refutes any contention that the identical resolution of each issue in Nos. 780 and 780-A resulted from Congressional pressure upon the Commission.
 
 
 126
 We also do not believe that the legislative intrusions, if any, into the Commission's decisional process in this case come within the Pillsbury rule.[30] As we read Pillsbury, the court's concern was with factual prejudice the prejudgment by the FTC of factual questions then pending before it.[31] A point of view even bias induced by legislative interference as to questions of law, on the other hand, does not necessarily render invalid an agency's decision, United States v. Morgan,313 U.S. 409, 421, 61 S.Ct. 999, 85 L.Ed. 1429 (1941); 2 Davis, Administrative Law Treatise, § 12.01 (1958). Members of an agency charged by Congress with adjudicatory functions "are assumed to be men of conscience and intellectual discipline capable of judging a particular controversy fairly on the basis of its own circumstances." United States v. Morgan, supra 313 U.S. at 421, 61 S.Ct. at 1004. Moreover, Judicial review is fully capable of correcting bias as to legal questions. See, e. g., Marquette Cement Mfg. Co. v. FTC, 147 F.2d 589, 594 (7th Cir. 1945), affirmed sub nom. FTC v. Cement Institute, 333 U.S. 683, 68 S.Ct. 793, 92 L.Ed. 1010 (1948). The essential adjudicative facts in the instant case are undisputed; all the issues decided by the Commission were entirely legal in nature concerning the interpretation of a contract and a certificate of public convenience. We have considered de novo as we are obligated to do each of the legal issues raised by Gulf; on each, we have independently reached the same conclusion as the Commission. Even assuming arguendo the Commission's decision reflected legislative interference, our decision does not.
 
 
 127
 Weighing these factors the importance and need for Congressional oversight of regulatory agencies, the Commission's evident strong backbone in resisting subcommittee pressure, the Commission's identical resolution of each issue in its prior decision, the entirely legal nature of the Commission's decision, and our agreement with that decision against our commitment to the principle that administrative agencies must be allowed to exercise their adjudicative functions free of Congressional pressure, we conclude that the legislative conduct in this case did not affect the fairness of the Commission's proceedings and does not warrant our setting aside the Commission's order.
 
 XI. CONCLUSION
 
 128
 For the reasons stated above, we find no merit in any of the arguments advanced by either petitioner. Accordingly, the order of the Federal Power Commission will be affirmed.
 
 APPENDIX
 
 129
 THIS AGREEMENT, made and entered into as of the ______ day of ______, 1963, by and between Gulf Oil Corporation, a Pennsylvania corporation, hereinafter referred to as "Seller," and Texas Eastern Transmission Corporation, a Delaware corporation, hereinafter referred to as "Buyer,"
 
 
 130
 WHEREAS, Buyer owns and operates a natural gas pipeline transmission system, together with facilities and properties used in connection therewith; and
 
 
 131
 WHEREAS, Seller owns or controls oil, gas and mineral leaseholds and/or lands located in southern Louisiana, and offshore thereof, and has a supply of gas in said areas available for delivery near Venice, Plaquemines Parish, Louisiana; and
 
 
 132
 WHEREAS, Buyer desires to purchase gas from Seller for a portion of the requirements of its said system; and
 
 
 133
 WHEREAS, the parties hereto have agreed that, except where the context otherwise indicates another or different meaning or intent, the following terms are intended and used herein and shall be construed to have meanings as follows:
 
 
 134
 6. The term "Daily Contract Quantity" shall mean the applicable quantity of gas set out in Paragraph 1(a) of Article II hereof.
 
 
 135
 NOW THEREFORE, in consideration of the premises and the mutual covenants and agreements herein contained, the parties hereto do hereby covenant and agree as follows:I. SCOPE OF AGREEMENT
 
 
 136
 1. Subject to all of the terms, conditions and limitations hereinafter set forth, Seller agrees to sell and deliver or cause to be delivered to Buyer, and Buyer agrees to purchase and receive from Seller, gas, in the quantities hereinafter provided.
 
 
 137
 4. From and after the date of initial delivery of gas under this Agreement and throughout the remainder of the stated term hereof, Seller warrants and agrees that there will be provided under the terms and provisions of this Agreement a quantity of gas sufficient to enable Seller to have available for delivery hereunder on any day or days a volume not less than one hundred twenty-five per cent (125%) of the Daily Contract Quantity in effect from time to time under the provisions of Sub-paragraph 1(a) of Article II hereof.
 
 II. QUANTITY OF GAS
 
 138
 1. (a) Subject to the provisions of this Agreement the Daily Contract Quantity to be effective on and after the date of initial delivery shall be as follows:
 
 
 139
 Commencing Daily Contract Quantity
 
 MCF/D
 
 140
 Date of Initial Delivery 150,000
 
 
 141
 November 1, 1965 250,000
 
 
 142
 November 1, 1966 325,000
 
 
 143
 November 1, 1967 425,000
 
 
 144
 November 1, 1968 through remaining 500,000
 
 
 145
 term of contract
 
 
 146
 (b) During each year of the term of this Agreement, Buyer agrees to take and pay for, or pay for if available and not taken, a quantity of gas equal to eighty per cent (80%) of the sum of each Daily Contract Quantity in effect during such year, multiplied by the number of days in such year each such Daily Contract Quantity is in effect.
 
 
 147
 (c) Buyer shall have the right to purchase from Seller hereunder at any time, and from time to time, quantities of gas greater than the Daily Contract Quantity then in effect hereunder; provided that Seller shall not be obligated to deliver in any day a quantity of gas in excess of one hundred twenty-five per cent (125%) of such Daily Contract Quantity. Buyer shall give Seller maximum prior notice, as permitted by its pipeline operating requirements, of changes in delivery rates of gas to be delivered hereunder.
 
 III. POINT OF DELIVERY
 
 148
 1. The point of delivery of the gas to be delivered by Seller to Buyer hereunder shall be at the outlet of Seller's meter station to be located at a mutually agreeable point in Section 25, Township 21 South, Range 30 East, Plaquemines Parish, Louisiana.
 
 X. FORCE MAJEURE
 
 149
 In the event of either party hereto being rendered unable, wholly or in part, by force majeure to carry out its obligations under this Agreement, other than to make payments due hereunder, it is agreed that on such party giving notice . . . then the obligations of the party giving such notice, as far as they are affected by such force majeure, shall be suspended during the continuance of any inability so caused . . . and such cause shall as far as possible be remedied with all reasonable dispatch. The term "force majeure" as employed herein shall mean acts of God, strikes, lockouts or other industrial disturbances, acts of the public enemy, wars, blockades, insurrections, riots, epidemics, landslides, lightning, earthquakes, fires, storms, floods, washouts, arrests and restraints of governments and people, civil disturbances, explosions, breakage or accidents to machinery or lines of pipe, the necessity for making repairs to or alterations of machinery or lines of pipe, freezing of wells or lines of pipe, the failure of production facilities for causes other than depletion of the source of gas supply, and any other causes, whether of the kind herein enumerated or otherwise, not within the control of the party claiming suspension; provided, however, that said term shall not mean or include any cause which by the exercise of due diligence the party claiming force majeure is able to overcome; and provided, further, that in no event shall said term mean or include partial or entire failure or depletion of gas reserves or sources of supply of gas. Such term shall likewise include (a) in those instances whether either party hereto is required to obtain servitudes, rights of way grants, permits or licenses to enable such party to fulfill its obligations hereunder, the inability of such party to acquire, or the delays on the part of such party in acquiring, at reasonable cost and after the exercise of reasonable diligence, such servitudes, rights of way
 
 XII. TERM
 
 150
 This Agreement shall be effective from the date hereof and shall continue and remain in full force and effect for a term of twenty-six (26) years from the date of initial deliveries of gas hereunder, or to the date on which four billion four hundred thirty-seven million six hundred seventy-five thousand (4,437,675,000) MCF of gas (exclusive of any excess gas purchased under the provisions of Article XVIII hereof) has been delivered to Buyer whichever shall first occur.
 
 XIV. REGULATORY BODIES
 
 151
 This Agreement is subject to all present and future valid orders, rules, and regulations of any regulatory body having jurisdiction.
 
 XV. ARBITRATION
 
 152
 Any dispute arising between Seller and Buyer out of this Agreement shall be determined by a board of three arbitrators to be selected for each such controversy so arising as follows: . . . Such board shall determine the matters submitted to it pursuant to the provisions of this Agreement. The action of a majority of the members of such board shall govern and their decision in writing shall be final and binding on the parties hereto. Each party shall pay the expense of the arbitrator selected by or for it and all other costs of the arbitration shall be equally divided between the parties hereto.
 
 
 153
 ALDISERT, Circuit Judge, dissenting.
 
 
 154
 With the majority, I agree that the Commission properly construed Gulf's daily delivery obligation under the contract. My disagreement with the majority, however, while tracking a narrow compass, requires a different result. I believe that Gulf's petition for review should be granted to the extent that it argues that the Federal Power Commission erred in refusing to defer its decision on the questions submitted to the arbitrator until it received the decision of the board of arbitrators.[1]
 
 
 155
 My starting point is the strong federal policy favoring enforcement of arbitration when the parties have mutually agreed to so resolve contract interpretation disputes. Thus, in cases arising under the Federal Arbitration Act, 9 U.S.C. §§ 1-14, it has been determined that "any doubts as to the construction of the Act ought to be resolved in line with its liberal policy of promoting arbitration both to accord with the original intention of the parties and to help ease the current congestion of court calendars. Such policy has been consistently reiterated by the federal courts and we think it deserves to be heartily endorsed." Robert Lawrence Co. v. Devonshire Fabrics, Inc., 271 F.2d 402, 410 (2d Cir. 1959) (citations omitted).
 
 
 156
 Coexistent with this congressionally-declared public policy is the root source of arbitration, the law of contracts, which directs that once parties have covenanted that arbitration shall be the method of resolving disputes, the parties should be held to that arbitration agreement. Gulf and Texas Eastern entered into a bargain relating to the delivery of natural gas. That bargain was reduced to a written contract containing a clear arbitration clause providing that "(a)ny dispute arising between Seller and Buyer out of this Agreement shall be determined by a board of three arbitrators . . . ." The Commission has conceded that the certificate issued by the FPC "accepted the contract with its arbitration provision"[2] Thus, we not only have parties to the contract agreeing that disputes over contract interpretation shall be first submitted to arbitration, but we have a situation where the Commission has approved that method as a first step to dispute resolution.
 
 
 157
 The Commission nevertheless concluded that because this proceeding involves "a matter of importance to the public," it, and not the arbitrators, should first decide the three issues submitted by Gulf to arbitration.[3] In American Safety Equipment Corp. v. J. P. Maguire & Co., 391 F.2d 821, 825-29 (2d Cir. 1968), perhaps the strongest support for the Commission's position, the arbitration agreement at issue was itself attacked as "an instrument of illegality". Id. at 827. Determining that such a claim under the antitrust laws was not merely a private matter, the court concluded that the antitrust claims raised were not appropriate for arbitration due to "the pervasive public interest in the enforcement of the antitrust laws, and the nature of the claims that arise in such cases." Id. at 827-28. At first glance, this reasoning appears to support the Commission's conclusion in the present case, that because the delivery of natural gas involves a matter of importance to the public, it should not defer its action until the arbitrators have acted.
 
 
 158
 But this argument ignores the unique procedures available in the case before us. Unlike the circumstances in American Safety, here a federal agency which proposes to circumvent the arbitration forum had the opportunity to intervene before there was any performance under the agreement. When it issued a certificate of public convenience to Gulf, the Commission had the authority to approve or reject the contract between Gulf and Texas Eastern in whole or in part. If the delivery of natural gas is, in the Commission's words, "a matter of importance to the public," and if "(w)hether or not Gulf is living up to its contract and to its certificate is a matter of deep concern to the Commission in meeting its responsibility under the Natural Gas Act," then the Commission had an obligation to reject that portion of the contract calling for arbitration of disputes between the parties to the contract at the time the contract was submitted to it for approval. Dictates of sound reason and fair justice demand that it should have asserted that position to the parties at the time the contract was submitted as the basis for the certificate.
 
 
 159
 Simply put, the Commission cannot have it both ways. It cannot approve a contract as the basis of a certificate in the public interest and later, after performance by the parties, abrogate crucial portions of the approved contract ostensibly in the same public interest. Although cloaked with much authority, the Commission has no power to rewrite a contract it has approved.
 
 
 160
 The arbitration clause clearly called for "interpretation of a contract of the parties concerning the sale and delivery of natural gas in interstate commerce." If such a clause is an anathema to the FPC, it should reject any contract containing such a provision. It did not. It approved the contract containing this clause. Having approved the contract with the arbitration clause, the FPC cannot later say that deferring to this procedure would be "unconscionable". Rather, the reverse would seem to be true. To me it is unconscionable for any federal agency to renege on any contractual procedure it has previously approved, and upon which it has issued a certificate of public necessity.
 
 
 161
 Thus, just as our mightiest corporations and industries entities which greatly affect the public interest are bound by arbitration clauses in labor and commercial matters, here the parties and the FPC are bound to the arbitration clause under the dictates of both federal policy and the contract language. The Commission's apparent position that it possesses specialized knowledge gained from experience in the regulation of industry, e. g., Texas Gas Corp. v. Shell Oil Co., 363 U.S. 263, 80 S.Ct. 1122, 4 L.Ed.2d 1208 (1960); Michigan Consolidated Gas Co. v. Panhandle Eastern Pipeline Co., 226 F.2d 60 (6th Cir. 1955), cert. denied, 350 U.S. 987, 76 S.Ct. 473, 100 L.Ed. 853 (1956), which knowledge entitles its interpretation of contract provisions dealing with natural gas to greater weight than that of a court or a board of arbitrators,[4] is of no avail. It misses what I consider to be the controlling issue at bar: it is not whose interpretation of the contract provisions ultimately prevails; rather, it is whether the parties and the Commission should be bound by their agreement as to the procedure for the initial resolution of interpretation conflicts. The Commission's reliance on Sunray Mid-Continent Oil Co. v. F. P. C., 364 U.S. 137, 80 S.Ct. 1392, 4 L.Ed.2d 1623 (1970), and Sun Oil Co. v. F. P. C., 364 U.S. 170, 80 S.Ct. 1388, 4 L.Ed. 1639 (1960), is, in my view, irrelevant because these cases deal with the interpretation, not the procedure for initial interpretation. Only after the arbitrators' decision is reached should the Commission, and ultimately the courts, be permitted to decide any possible conflict between the legal precept that "(i)t is the arbitrator's construction which was bargained for," United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 599, 80 S.Ct. 1358, 1362, 4 L.Ed.2d 1424 (1960), and the FPC contention that because the three matters submitted to arbitration are matters requiring special expert knowledge, the arbitrators' interpretation will not be honored.
 
 
 162
 If the Commission wishes to commit its expert knowledge to the interpretation of all contractual provisions dealing with the distribution of natural gas, then, as a matter of policy, it should refuse to approve contracts between producers and distributors that contain arbitration provisions. But once it has given its approval, as it did here, it cannot blithely turn its face against the overriding important federal policy favoring arbitration.
 
 
 163
 Accordingly, I dissent from the denial of the petition to review the Commission's order.
 
 
 
 [1]
 The petitioners in No. 77-1050 are the Connecticut Public Utilities Control Authority, the Massachusetts Department of Public Utilities, the Attorney General of Rhode Island, the Rhode Island Division of Public Utilities and Carriers, and the Rhode Island Consumers' Council. Gulf Oil Corporation is an intervenor in No. 77-1050
 
 
 [2]
 The intervenors in No. 76-2596 are the Washington Urban League, the Texas Eastern Transmission Co., Brooklyn Union Gas Co., Public Service Electric and Gas Co., the Public Service Commission of New York, Philadelphia Gas Works, Customers of Philadelphia Gas Works, and the several New England entities who are petitioners in No. 77-1050
 
 
 [3]
 Section 706 provides:
 Scope of review
 To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall
 (1) compel agency action unlawfully withheld or unreasonably delayed; and
 (2) hold unlawful and set aside agency action, findings, and conclusions found to be
 (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
 (B) contrary to constitutional right, power, privilege, or immunity;
 (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
 (D) without observance of procedure required by law;
 (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
 (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
 In making the foregoing determinations, the court shall review the whole record or those parts of cited by a party, and due account shall be taken of the rule of prejudicial error.
 
 
 [4]
 Pertinent parts of the contract are reprinted as an appendix to this opinion. Individual paragraphs are quoted throughout the body of the opinion
 
 
 [5]
 The figure of 4,437,675,000 MCF represents the product of multiplying the number of days in a year (365 or 366) by 26 years and then multiplying this figure by the DCQ of 500,000 MCF with appropriate adjustments for the lower DCQ's during the start-up period
 
 
 [6]
 Gulf's reference in its 1971 petition to amend the certificate to "maximum required deliveries of 625 million cubic feet per day" casts considerable doubt on its present contention that the parties to the contract did not contemplate daily deliveries in that amount. We recognize, however, that neither the doctrine of res judicata nor that of collateral estoppel binds Gulf to the position which it formerly took. See generally 1B Moore's Federal Practice P 0.441 at 3771 et seq. (1974 ed.)
 
 
 [7]
 On January 13, 1976, Texas Eastern filed suit against Gulf in the United States District Court for the Southern District of Texas, Houston Division, to enjoin the arbitration. A motion for a preliminary injunction is now pending in that action
 
 
 [8]
 9 U.S.C. § 2 provides that a "provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . or the refusal to perform the whole or any part thereof, . . . shall be valid, irrevocable and enforceable."
 
 
 [9]
 E. g., William E. Arnold Co. v. Carpenters District Council, 417 U.S. 12, 94 S.Ct. 2069, 40 L.Ed.2d 20 (1974); United Steelworkers of America v. Warrior and Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); United Steelworkers of America v. American Manufacturing Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); J. S. & H. Const. Co. v. Richmond County Hospital Authority, 473 F.2d 212 (5th Cir. 1973)
 
 
 [10]
 We reject Gulf's contention that the Commission's enforcement of its certificate of public convenience is subject to the discretion of the court by analogy to the equitable principles dealing with specific performance. Each order to comply with a certificate is, in a sense, an order of specific performance, but that alone does not make it subject to the equitable discretion of the court. We may set aside the Commission's order only if it constitutes an abuse of discretion or otherwise fails to meet the standards of the Administrative Procedure Act, 5 U.S.C. § 706(2). The analogy to specific performance is of no help in making that determination
 
 
 [11]
 We find it unnecessary to consider the Commission's contention that performance of a Natural Gas Act certificate obligation can be excused only upon a showing that performance would impair the certificate holder's overall financial integrity. Cf. Permian Basin Area Rate Cases, 390 U.S. 747, 822, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968); FPC v. Sierra Pacific Power Co., 350 U.S. 348, 350, 76 S.Ct. 368, 100 L.Ed. 388 (1956)
 
 
 [12]
 See, e. g., Restatement of Contracts, § 502 (1932):
 (W)here parties on entering into a transaction that affects their contractual relations are both under a mistake regarding a fact assumed by them as the basis on which they entered into the transaction, it is voidable by either party if enforcement of it would be materially more onerous to him than it would have been had the fact been as the parties believed it to be . . . .
 
 
 [13]
 According to Gulf's witness, Dr. Walter Shellshear, Gulf preferred to enter into a warranty contract rather than into the usual contract of dedication of a specific gas field because it "did not want to reveal any of its confidential geological information . . . ."
 
 
 [14]
 Cf. Hatt v. Walker, 33 S.W.2d 489, 499 (Tex.Civ.App.1930), holding that it is "a matter of fact of which courts will take judicial notice that the existence of or the duration of the existence of petroleum within the limits of a particular tract of land is uncertain."
 
 
 [15]
 See also Trans World Airlines, Inc. v. Skyline Air Parts, Inc., 193 A.2d 72 (D.C.App.1963), holding that a party who makes a binding contract to sell goods which he has already sold to another is not excused from performance by virtue of his unilateral, negligent mistake
 The same result obtains under Article 2 of the Uniform Commercial Code, which we assume is applicable to the Gulf-Texas Eastern contract. Cf., e. g., Amoco Pipeline Co. v. Admiral Crude Oil Corp., 490 F.2d 114 (10th Cir. 1974); Oskey Gasoline & Oil Co. v. OKC Refining Inc., 364 F.Supp. 1137 (D.Minn.1973). An express warranty under U.C.C. § 2-313 may extend to the quantity of goods to be sold. See, e. g., A. A. Baxter Corp. v. Colt Industries, Inc., 10 Cal.App.3d 144, 88 Cal.Rptr. 842, 847 (1970).
 
 
 [16]
 The Commission and various intervenors suggest a number of other reasons why Gulf's defense of mistake is without merit that the mistake was not mutual, that a mistaken prediction as to a future fact known to be uncertain cannot relieve a party of his contractual obligations, and that the mistake as to Delta Block 27 was not even material in view of Gulf's partial reliance on other gas reserves. We need not pass on any of these questions
 
 
 [17]
 Gulf's argument rests heavily on Judge Maris' decision in Panhandle Eastern Pipe Lines v. FPC, 236 F.2d 289, 292 (3d Cir. 1956), and its contention that the Commission's determination in Nos. 692 and 692-A as to Gulf's contractual obligations was not necessary to the result of that proceeding i. e., the determination that an amendment of Gulf's certificate was not justified by public convenience or necessity. The Commission supports its use of collateral estoppel with citations to United States v. Utah Const. Co., 384 U.S. 394, 419, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966); FTC v. Texaco, Inc., 170 U.S.App.D.C. 323, 329-334, 517 F.2d 137, 143-48 (1975), cert. granted 431 U.S. 974, 97 S.Ct. 2940, 53 L.Ed.2d 1072 (1977); In Re Federal Water & Gas Corp., 188 F.2d 100, 104-05 (3d Cir.), cert. denied 314 U.S. 953, 71 S.Ct. 1018, 95 L.Ed. 1375 (1951). The question of res judicata and collateral estoppel in the administrative agency context is discussed in 2 K. Davis, Administrative Law Treatise §§ 18.02, 18.03 (1958)
 
 
 [18]
 The Commission explained its position once again in Opinion No. 780-A:
 New England argues . . . that allowing Gulf to recoup its refund at the end of the contract period renders the entire refund a nullity. As noted, Gulf will lose the time value of the refund amount until recoupment. Further, if the refund represented compensation for ultimate failure to deliver gas rather than delay in delivering gas, Gulf would be relieved of its obligation to deliver the gas for which the refund represented compensation. Various of the customers have objected strenuously to any procedure which will relieve Gulf of its obligation, and we agree. If the refund provision were taken as full compensation for the non-delivered gas, Texas Eastern and its customers would have no claim on Gulf before Gulf had delivered 4.4 TCF. They would then have to buy in the general market at a time when, under this order, Gulf is permitted to begin to recoup its refund while continuing to be obliged to deliver gas.
 
 
 [19]
 In its brief, Gulf also argues that it was not given adequate notice and an opportunity to be heard on the issue of refunds. At oral argument, however, counsel for Gulf informed the court that Gulf did not wish to press that argument. Under these circumstances, we think it appropriate to limit our discussion of this issue to the following observations: First, the record demonstrates that regardless of possible deficiencies of notice in the original show cause order, subsequent events put Gulf on early notice that the Commission would consider the issue of refunds. Second, the record also reveals that Gulf prepared and presented its position on the matter of refunds with considerable vigor in the FPC proceedings, notwithstanding its alleged lack of notice. Third, all of the cases cited by Gulf for the proposition that midstream notice or late notice cannot be any better than no notice at all concern the adequacy of notice in rule-making proceedings. See, e. g., Consolidated Edison Co. v. FPC, 168 U.S.App.D.C. 92, 512 F.2d 1332 (1975); Mobil Oil Corp. v. FPC, 483 F.2d 1238, 157 U.S.App.D.C. 235 (1973); Buckeye Power, Inc. v. EPA, 481 F.2d 162 (6th Cir. 1973), cert. denied, 425 U.S. 934, 96 S.Ct. 1663, 48 L.Ed.2d 175 (1976); Texaco Inc. v. FPC, 412 F.2d 740 (3d Cir. 1969). Accordingly, we see no reason to reverse or modify the Commission's order on the ground of inadequate notice and opportunity to be heard
 
 
 [20]
 In its brief to this court and at oral argument, the FPC attempted to justify its refund order also by reference to section 7(b) of the Act, 15 U.S.C. § 717f(b):
 (b) No natural-gas company shall abandon all or any portion of its facilities subject to the jurisdiction of the Commission, or any service rendered by means of such facilities, without the permission and approval of the Commission . . . .
 The Commission argues in its brief that any reduction in the quantity of gas delivered constitutes an abandonment of service within the meaning of section 7(b) and requires prior Commission approval. Panhandle Eastern Pipe Line Co. v. Michigan Consolidated Gas Co., 177 F.2d 942, 945 (6th Cir. 1949); cf. United Gas Pipe Line Co. v. FPC, 385 U.S. 83, 86-89, 87 S.Ct. 265, 17 L.Ed.2d 181 (1966). See also Reynolds Metals Co. v. FPC, 534 F.2d 379, 384 (D.C.Cir. 1976). The Commission argues that Gulf's underdeliveries to Texas Eastern therefore constitute a violation of section 7(b), and that the refund order is a proper exercise of Commission authority under that section combined with section 16.
 Attractive as this argument may be, we are not permitted to consider it, for the Commission's reliance on section 7(b) has come too late. In Opinion No. 780-A, the Commission placed exclusive reliance on section 7(c), even after section 7(b) was brought to its attention on the issue of refunds. Since "a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency," SEC v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947), we may review the refund order only by reference to section 7(c), the sole ground invoked by the agency. See also Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168-69, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962).
 
 
 [21]
 Section 7(a), 15 U.S.C. § 717f(a), provides in pertinent part:
 (a) Whenever the Commission . . . finds such action necessary or desirable in the public interest, it may by order direct a natural-gas company to . . . sell natural gas to any person . . . legally authorized to engage in the local distribution of natural or artificial gas to the public.
 Section 7(e), 15 U.S.C. § 717f(e), provides in pertinent part:
 (e) Except in the cases governed by the provisos contained in subsection (c) (not relevant to this case), a certificate shall be issued to any qualified applicant therefor, authorizing the whole or any part of the operation, sale (or) service . . . covered by the application, if it is found that the applicant is able and willing properly to do the acts and to perform the service proposed . . . and that the proposed service, sale or operation . . ., to the extent authorized by the certificate, is or will be required by the present or future public convenience and necessity; . . . .
 
 
 [22]
 The Mesa court also rejected the contention that a refund order is a matter of equity within the exclusive jurisdiction of the courts as well as the argument that the refunds constituted an unauthorized "penalty." The court also expressed its belief that "it is of no consequence that there were other avenues which the Commission could have chosen for enforcement, such as an injunction, or a criminal proceeding." 441 F.2d at 189
 
 
 [23]
 See note 20, supra
 
 
 [24]
 Mobil Oil Corp. v. FPC, 157 U.S.App.D.C. 235, 254, 483 F.2d 1238, 1257 (1973); New England Power Co. v. FPC, 151 U.S.App.D.C. 371, 372, 467 F.2d 425, 426 (1972) aff'd 415 U.S. 345, 94 S.Ct. 1151, 39 L.Ed.2d 383 (1974); City of Chicago v. FPC, 458 F.2d 731 (D.C.Cir. 1971) cert. denied, 405 U.S. 1074, 92 S.Ct. 1495, 31 L.Ed.2d 808 (1972); Murphy Oil Corp. v. FPC, 431 F.2d 805, 810 (8th Cir. 1970). Gulf also cites FPC v. Texaco, Inc., 417 U.S. 380, 94 S.Ct. 2315, 41 L.Ed.2d 141 (1974), but the Supreme Court held there only that section 16 "does not authorize the Commission to set at naught an explicit provision of the Act." Id. at 394, 94 S.Ct. at 2325
 
 
 [25]
 The Commission had before it a copy of the agenda for a meeting of Gulf's law department shortly after the issuance of Opinion No. 692. Three possible corporate actions were listed for discussion:
 A. A decision not to commit additional gas to the performance of the Texas Eastern Contract at the present contract prices.
 B. A decision to make no decision but await action by the Commission, Texas Eastern, Texas Eastern's customers, or a representative of the public, to enforce the contract and/or the certificate before the Commission or in the courts.
 C. A decision to make every effort to fulfill the contract by delivery of all gas which can be reasonably delivered to Texas Eastern.
 In light of Gulf's subsequent conduct, the Commission may reasonably have inferred that Gulf chose Option B, knowing full well that the Commission would view underdeliveries as a violation of the certificate. This evidence of Gulf's attitude affords additional justification for the refund-recoupment order.
 
 
 [26]
 For an explanation of these rates, see Shell Oil v. FPC, 520 F.2d 1061, rehearing denied, 525 F.2d 1261 (5th Cir. 1976), cert. denied, 426 U.S. 941, 96 S.Ct. 2661, 49 L.Ed.2d 394 (1976)
 
 
 [27]
 We also can discern no error in the rates of interest set by the Commission 7 percent per annum for underdeliveries prior to October 10, 1974, and 9 percent thereafter in the absence of any indication that they are too high other than Gulf's unsupported assertion that they are "plainly excessive." Cf. American Public Gas Assoc. v. FPC, 546 F.2d 983, 987-88 (D.C.Cir. 1976); City of Cleveland v. FPC, 174 U.S.App.D.C. 1, 6-7, 525 F.2d 845, 850-51 n. 38 (1976)
 
 
 [28]
 When the interrogation by a member of the Subcommittee on Oversight and Investigation invaded the decisional area of the FPC's function, FPC General Counsel Journey replied that it would be inappropriate for him to comment. Chairman Dingell of the subcommittee responded that it was not the intention of his committee to "intrude into matters under judicial consideration by the Commission . . . I want your understanding to be very clear on that point." He reemphasized that the committee was not interested in influencing the consideration, deliberation, or conclusions of the Commission
 The Subcommittee on Energy and Power was concerned at its oversight hearing with the Commission's failure generally to seek enforcement of gas production contracts by court injunction rather than administrative hearings. At the hearings of this subcommittee, Counsel Journey again pointed out the inappropriateness of discussing the merits of the FPC's pending enforcement action against Gulf and Texas Eastern. This subcommittee's interrogation may have been indelicate at points since counsel were asked repeatedly not only why the Commission had opted to follow the time consuming show cause procedure rather than to seek an immediate injunction against further underdeliveries by Gulf, but also for their views on the interpretation of the Gulf-Texas Eastern contract. FPC counsel, however, carefully refrained from discussing the merits of the issues.
 
 
 [29]
 Each of the subcommittees consisted of sixteen members
 
 
 [30]
 D.C. Federation of Civic Associations v. Volpe, 148 U.S.App.D.C. 207, 221-24, 459 F.2d 1231, 1245-49 (1972), is also not apposite. The basis on which the order of the Secretary of Transportation was held invalid in that case was not the existence of Congressional pressure upon him but his consideration in reaching his decision of factors "that Congress could not have intended to make relevant." Id., 148 U.S.App.D.C. at 222, 459 F.2d at 1246
 
 
 [31]
 See 354 F.2d at 958; Note, 42 N.Y.U.L.Rev. 127, 128-29 (1967). Pillsbury is also noted in 52 Va.L.Rev. 946 (1966); 66 Colum.L.Rev. 1351 (1966); and 50 Minn.L.Rev. 1136 (1966)
 
 
 [1]
 As stated by the Commission, there are before the arbitrators three questions:
 (1) whether Gulf's obligation for delivery of gas to Texas Eastern is limited to gas produced in the vicinity of the delivery points, (2) whether Gulf by reason of the mistakes as to gas reserves in West Delta Block 27 is excused from delivering the DCQ as provided in the contract, and (3) whether the failure of the Department of the Interior to hold regular general offshore Louisiana lease sales constituted an act of force majeure to relieve Gulf of its obligations.
 Opinion No. 780 at 296A.
 
 
 [2]
 Opinion No. 780 at 297A
 
 
 [3]
 The Commission's discussion on this subject follows:
 Gulf argues that because the Commission certificated the 1964 contract between Gulf and Texas Eastern, including the arbitration provision (Article XI), the question of the nature and extent of Gulf's obligations under the contract is properly before the arbitration board and is not within the primary jurisdiction of the Commission and therefore in a proper and reasonable exercise of its jurisdiction the Commission should reserve its ruling in the instant proceeding until such time as it received the benefit of the arbitrators' decision. In the opinion of the Commission this is not an appropriate case in which to defer decision.
 There are before the arbitrators three questions: (1) whether Gulf's obligation for delivery of gas to Texas Eastern is limited to gas produced in the vicinity of the delivery points, (2) whether Gulf by reason of the mistakes as to gas reserves in West Delta Block 27 is excused from delivering the DCQ as provided in the contract, and (3) whether the failure of the Department of the Interior to hold regular general offshore Louisiana lease sales constituted an act of force majeure to relieve Gulf of its obligations. These are largely technical matters relating to Gulf's service under its certificate. Thus the effect of designating a delivery point and defining what might be its vicinity, the effect of a mistake as to gas reserves and the effect of a moratorium on offshore leases on the ability of Gulf to deliver gas are matters peculiarly within the subject matter of this Commission's authority. In Michigan Consolidated Gas Co. v. Panhandle Eastern Pipeline Co., 226 F.2d 60 (CA6-1955), certiorari denied, 350 U.S. 987, 76 S.Ct. 473, 100 L.Ed. 853 (1956), cited by Gulf, the Court said that intricate problems of service and problems of changing industrial conditions and growing needs of natural gas do not lend themselves in the first instance to hearing before a court and require the expertise of the Commission. The court contrasts these matters with the usual questions of law and fact which a court is authorized to handle and which require no special expert knowledge. The questions here belong in the first category and are properly considered by the Commission prior to submission to an arbitration board or a court. While our certificate accepted the contract with its arbitration provision, this did not mean that questions within the peculiar competence of the Commission must be first put before the board but rather the contractual matters that a court would handle.
 Furthermore, this proceeding involves a matter of importance to the public. Whether or not Gulf is living up to its contract and to its certificate is a matter of deep concern to this Commission in meeting its responsibilities under the Natural Gas Act. To defer further action until a board of arbitration issues an interpretation of the contract of the parties in a matter concerning the sale and delivery of gas in interstate commerce would at this juncture be unconscionable action on our part.
 Opinion No. 780 at 295A-97A.
 
 
 [4]
 Indeed, an inference can be drawn from the Commission's brief that the Commission believes it should have exclusive, virtually non-reviewable authority in this respect