GULF OIL CORPORATION,
Petitioner in No. 82–3035,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,

Philadelphia Gas Works, Public Service Commission of the State of New York, Consolidated Edison Company of New York, Inc., Public Service Electric and Gas Company, New Jersey Natural Gas Company, Washington Urban League, the Brooklyn Union Gas Company, Texas Eastern Transmission Corporation, Intervenors.

GULF OIL CORPORATION,
Petitioner in No. 82–3132,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,

Philadelphia Gas Works, Public Service Commission of the State of New York, Washington Urban League, and Texas Eastern Transmission Corporation, Intervenors.

WASHINGTON URBAN LEAGUE,
Petitioner in No. 82–3137,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,

Philadelphia Gas Works, Public Service Commission of the State of New York, Public Service Electric and Gas Company, Texas Eastern Transmission Corporation, and Gulf Oil Corporation, Intervenors.

The PUBLIC SERVICE COMMISSION
OF the STATE OF NEW YORK,
Petitioner in No. 82–3166,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,

Gulf Oil Corporation, Public Service Electric and Gas Company, Texas Eastern Transmission Corporation, Intervenors,

The Brooklyn Union Gas Company,
Intervenor.

PHILADELPHIA GAS WORKS,
Petitioner in No. 82–3167,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,

Gulf Oil Corporation, Texas Eastern
Transmission Corporation,
Intervenors,

The Brooklyn Union Gas Company,
Intervenor.

GULF OIL CORPORATION,
Petitioner in No. 82–3242

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,

Public Service Electric and Gas Company,
Texas Eastern Transmission
Corporation, Intervenors,

Washington Urban League, Intervenor.

Nos. 82–3035, 82–3132, 82–3137, 82–3166,
82–3167 and 82–3242.

United States Court of Appeals,
Third Circuit.

Argued Jan. 7, 1983.

Decided April 21, 1983.

Rehearing and Rehearing In Banc
Denied June 15, 1983.

As Amended June 15 and 17, 1983.

Robert W. Fuller, Lawrence E. Glenn, Houston, Tex., Warren M. Sparks, Sparks & Sparks, Tulsa, Okl., Carroll L. Gilliam (argued), Craig W. Hulvey, Kevin Sweeney, Washington, D.C., for Gulf Oil Corp.; Grove, Jaskiewicz, Gilliam & Cobert, Washington, D.C., of counsel.

Charles A. Moore, Gen. Counsel, Jerome M. Feit, Sol., Joshua Z. Rokach (argued), F.E.R.C., Washington, D.C., for F.E.R.C., respondent in Nos. 82–3035, 82–3132, 82–3137, 82–3166, 82–3167 and 82–3242.

Joseph R. Davison (argued), Leonard, Tillery & Davidson, Obermayer, Rebmann, Maxwell & Hippel, Philadelphia, Pa., for Philadelphia Gas Works, intervenor in Nos. 82–3035, 82–3132 and 82–3137, and petitioner in No. 82–3167.

David E. Blabey, Gen. Counsel, Public Service Com'n of State of N.Y., Albany, N.Y., Richard A. Solomon (argued), Dennis Lane, Wilner & Scheiner, Washington, D.C., for The Public Service Com'n of State of N.Y., intervenor in Nos. 82–3035, 82–3132 and 82–3137 and petitioner in No. 82–3166.

William I. Harkaway, McCarthy, Sweeney & Harkaway, Washington, D.C., for Consolidated Edison Co. of New York, Inc., intervenor in No. 82–3035.

James R. Lacey, William R. Hoatson (argued), Newark, N.J., for Public Service Electric and Gas Co., intervenor in Nos. 82–3035, 82–3137, 82–3166 and 82–3242.

Nicholas W. Mattia, Jr., Conway, Reiseman, Bumgardner & Kleinfeld, Newark, N.J., for New Jersey Natural Gas Co., intervenor in No. 82–3035.

Morton L. Simons (argued), Simons & Simons, Charles E. Hill, Washington, D.C., for Washington Urban League, petitioner in No. 82–3137 and intervenor in Nos. 82–3035, 82–3132 and 82–3242.

James W. McCartney, Judy M. Johnson, J. Craig Youngblood (argued), Vinson & Elkins, Jack E. Earnest, Jack D. Head, Cheryl M. Foley, Houston, Tex., for Texas Eastern Transmission Corp., intervenor in Nos. 82–3035, 82–3132, 82–3137, 82–3166, 82–3167 and 82–3242.

Before ALDISERT, GIBBONS and HIGGINBOTHAM, Circuit Judges.

## OPINION OF THE COURT

A. LEON HIGGINBOTHAM, Jr., Circuit Judge.

This appeal challenges six separate orders of the Federal Energy Regulatory Commission ("FERC" or "the Commission"[1]). The litigation stems from the failure of the Gulf Oil Corporation ("Gulf") to deliver specified daily quantities of gas to Texas Eastern

---

1. The term "Commission" refers to action taken by the Federal Power Commission, (FPC), prior to October 1, 1977 and the actions of the FERC after that date.

Transmission Corporation ("Texas Eastern") pursuant to the requirement of a 1963 contract and a certificate of convenience and necessity. In *Gulf Oil Corp. .v. Federal Power Commission,* 563 F.2d 588 (3d Cir. 1977), *cert. denied,* 434 U.S. 1062, 98 S.Ct. 1235, 55 L.Ed.2d 762 (1978) ("Gulf Oil I"),[2] this court affirmed a 1976 Commission order holding that Gulf had not complied with its certificate and contract obligations involving gas delivery as well as establishing daily warranty requirements and imposing refund-recoupment duties. The court left to the Commission's determination the details of the refund-recoupment payment plan. In conducting this subsequent proceeding, the Commission bifurcated the case into (a) those issues relating to the mechanics of the refund-recoupment; and (b) those issues concerning *force majeure.* There are three issues on appeal here. They are: (1) whether the Commission properly fashioned the refund-recoupment payment plan by or-

dering Gulf to pay into an escrow fund the amount due with interest for past underdeliveries of gas through December 15, 1976;[3] (2) whether the Commission erred as a matter of law in its findings that approved Gulf's claims that certain volumes of gas could be attributed to *force majeure* and thereby reduce its refund payment;[4] and (3) whether the Commission properly granted standing to the Washington Urban League ("WUL"), as an intervenor, to seek rehearing of the Commission's orders on the refund payment plan.[5] Gulf urges that the Commission's orders regarding the refund-recoupment payment be set aside. Several intervening parties urge with the FERC that the orders be affirmed. In the *force majeure* portion of the proceeding, Gulf as an intervenor joins the FERC and urges that the Commission's order be enforced in full. The petitioners, the Public Service Commission of New York ("PSCNY") and

**2.** The numerical indication of the cases refers to this court's review of the Commission orders relating to the 1963 contract between Gulf Corporation and Texas Eastern Corporation and the subsequent certificate of convenience and necessity issued to Gulf by the FERC. This court's second review of a Commission order relating to that contract and certificate is found in *Gulf Oil v. FERC,* 575 F.2d 67 (3d Cir.1978) ("*Gulf Oil II* "). That case affirmed the Commission's decision to deny Gulf's application to abandon sales of natural gas to Tennessee Gas Pipeline Company in order to use the reserves to meet its obligation to Texas Eastern.

**3.** This court has consolidated appeals docketed as Nos. 82–3035, 82–3132, and 82–3137. At issue is the Commission's establishment of a plan for Gulf's computation of refunds for underdeliveries to Texas Eastern as a result of a breach of the warranty contract. The review in those two cases arises from the FERC orders of January 17, 1979 (I App.-B, p. 143), December 18, 1981 (I App.-B, p. 363), and March 29, 1982 (I App.-B, .p. 517). Gulf Oil is the petitioner and the FERC the respondent in both 82–3035 and 82–3132. In 82–3132, the respondent intervenors· are the Philadelphia Gas Works, the Public Service Commission of the State of New York, Texas Eastern Corporation and The Washington Urban League. The respondent intervenors in 82–3035 are the Philadelphia Gas Works, the Public Service Commission of the State of New York, Consolidated Edison Company of New York, Inc., Public Service Electric and Gas Company, New Jersey Natural Gas Company, Washington Urban League, the Brooklyn Union Gas Company, and Texas East-

ern Transmission Corporation. In No. 82–3137, the Washington Urban League is the petitioner, challenging the December 18, 1981 Order of the FERC. The FERC is the respondent and the Philadelphia Gas Works, the Public Service Commission of the State of New York, the Public Service Electric and Gas Company, Texas Eastern Transmission Corporation and the Gulf Oil Corporation are the respondent intervenors.

**4.** In Docket Nos. 82–3166, 82–3167 and 82–3137, the petitioners challenge the FERC order of January 22, 1982 (Opinion No. 136) (II App., p. 27), determining whether those volumes of gas attributable to *force majeure* events are accurate and reasonable. In Docket Nos. 82–3166 and 82–3167, the Public Service Commission of the State of New York and the Philadelphia Gas Works, Gulf Oil Corporation, Public Service Electric and Gas Company, Texas Eastern Transmission Corporation, and the Brooklyn Union Gas Company are respondent intervenors in No. 82–3166. In 82–3167, the intervenors are the same with the omission of the Public Service Electric and Gas Company. In 82–3137, the WUL also challenges the FERC Order of January 22, 1982.

**5.** No. 82–3242 is an appeal of the Commission orders of March 29, 1982 (*reprinted* I App.-B p. 517) and of April 12, 1982 (II App. p. 67), denying rehearing of Opinion No. 136. Respondent intervenors are the Public Service Electric and Gas Company, Texas Eastern Transmission Corporation and the Washington Urban League.

the Philadelphia Gas Works ("PGW") and the Washington Urban League ("WUL") oppose the Commission's order. The final petition for review is brought by Gulf Oil in opposition to FERC order granting standing to the "WUL", an intervenor, to seek rehearing of the Commission's refund payment orders. Finding no merit in petitioner's challenges to the refund-recoupment payment plan and to the WUL's standing,[6] we will deny these petitions to set aside the Commission's orders. We will grant the petition to set aside the Commission's order on the *force majeure* issue, and address that single issue in this opinion.

I.

A. *Gulf Oil I.*

The present case relates to earlier litigation between the Gulf Oil Company and the FERC. Section 7(c) of the Natural Gas Act of 1938, 15 U.S.C. § 717f(c) (1970), gives the Commission supervisory power over the sale of natural gas. The Commission executes these duties in part by issuing a certificate of "convenience and necessity" to the seller. In 1963, Gulf Oil applied for such a certificate to distribute gas to Texas Eastern for a twenty-six year period. The certificate that FERC issued to Gulf mirrored the con-

tract terms between Gulf and Texas Eastern.

In 1975, the Commission initiated a show cause order against Gulf for alleged contract violations and against Texas Eastern because it had not submitted a complaint to the agency about the violations. Gulf's failure to meet contract requirements goes back to 1971, when Gulf applied to the Commission to amend its certificate because it had mistakenly estimated the supply of one of its reserve fields.[7] Gulf's deliveries to Texas Eastern fell short of Texas Eastern's demands beginning in 1973; beginning in 1974, Gulf's deliveries fell short of the contract specified quantities. The Commission held that Gulf failed to comply with both its certificate of operation and its 1963 contract obligation with Texas Eastern. (FERC Opinions No. 780, I App.–B, p. 60–81, No. 780–A, p. 82–102). The Commission ordered Gulf to deliver a maximum of 625 Million cubic feet ("Mmcf") daily and it prescribed a "refund-recoupment" formula for reimbursement to Texas Eastern and its customers for the undelivered volumes of gas. The formula included an offset to the refund-recoupment up to the allowable *force majeure* volumes as provided in Article X of the contract.[8]

---

6. On January 15, 1982, Gulf filed an application for rehearing and reconsideration of the Commission's December 18, 1981 order. On January 18, 1982, WUL also filed an application for rehearing. Gulf now challenges WUL's standing to file that application. We need not decide whether WUL is an aggrieved party within the meaning of the Natural Gas Act, 15 U.S.C. § 717r(b). The substantive issues which WUL raises are appropriately before us because they have been raised by Gulf.

7. Gulf applied to the Commission for an amendment to its certificate in 1971. Gulf asked for an increase in the gas purchase price under the contract stating that it had overestimated the reserves available from one of its sources of supply, the West Delta Block 27. The Commission denied the application on the grounds that Gulf's obligations to deliver the gas to Texas Eastern at the certificate price were unconditional and not dependent upon a specific source of gas. (II App. p. 17).

8. Article X of the contract lists twenty-seven possible *force majeure* events and also contains

a standard disclaimer clause. Article X reads in part:

X. FORCE MAJEURE

In the event of either party hereto being rendered unable, wholly or in part, by force majeure to carry out its obligations under this Agreement, other than to make payments due hereunder, it is agreed that on such party giving notice ... then the obligations of the party giving such notice, as far as they are affected by such force majeure, shall be suspended during the continuance of any inability so caused ... and such cause shall as far as possible be remedied with all reasonable dispatch. The term "force majeure" as employed herein shall mean acts of God, strikes, lockouts or other industrial disturbances, acts of the public enemy, wars, blockades, insurrections, riots, epidemics, landslides, lightning, earthquakes, fires, storms, floods, washouts, arrests and restraints of governments and people, civil disturbances, explosions, breakage or accidents to machinery or lines of pipe, the necessity for making repairs to or alterations of machinery or lines of pipe, freezing of wells or

Gulf Oil appealed the Commission's opinions and this court affirmed them in their entirety in *Gulf Oil I.* We therefore made several determinations which are binding in the instant case. First, *Gulf Oil I* settled the dispute of daily contract requirements. The court required Gulf to deliver daily a minimum of 500 Mmcf and a maximum of 625 Mmcf, unless Texas Eastern demanded less, until the contract expired. Over the life of the contract, Gulf was to deliver to Texas Eastern a total of 4.4 Trillion cubic feet ("Tcf"). Secondly, the court expressly rejected Gulf's contention that the failure of the Department of Interior to hold offshore lease sales constituted *force majeure* which excused Gulf from meeting its required daily quantity. The court found that Gulf's mistaken estimate of the sources of gas supply, which increased the need for offshore leases, was not the type of mistake included in the *force majeure* clause. The court further determined that the Gulf contract was a warranty contract and not a contract conditioned on the supply of available gas. Finally, the court found that the Commission had proper authority to design a remedy of refunds and recoupment of refunds to Texas Eastern and its customers consisting of an amount of money equal to the deficiencies in the daily delivery obligations.

The Commission's order as affirmed by the court in *Gulf Oil I* required Gulf to file regular reports computing the refunds attributable to the underdeliveries. (I App. p. 77). The Commission also ordered Gulf to "recoup refunds" through surcharges when the volumes remaining to be delivered under the contract equaled the volumes of prior underdeliveries. (I App. p. 78). Gulf was directed to tender refund payments to Texas Eastern within 30 days after the Commission approved Gulf's computations. The Commission directed Texas Eastern to survey its customers and the affected state regulatory commissions and to file a plan for the flow through of Gulf's payments. (I App. p. 78). The Commission contemplated that further proceedings would be held as to the distribution of the refund payments and the calculation of those volumes attributable to *force majeure.* (I App. p. 90).

## B. Later Commission Proceedings.

### 1. The Force Majeure Hearing.

The Commission's decision of January 17, 1979 ordered a formal hearing before an Administrative Law Judge (ALJ) to resolve specified issues involving *force majeure.* (II App. 1–9). The Commission's order directed the ALJ to determine the accuracy and reasonableness of allowable *force majeure* volumes as designated in Article X. The hearing afforded Gulf an opportunity to show *force majeure* events under the contract which would excuse its daily delivery obligations (II App. p. 7–8).

Gulf argued that its daily warranty obligation required it to have available a maximum of 625 Mmcf less *force majeure* volumes (II App. p. 23). Gulf supported this claim on the theory that in order to produce a daily maximum of 625 Mmcf, Gulf would have to obtain gas from the fields ordinarily relied upon in addition to the reserve fields. Consequently Gulf would have been required to use all of its fields to produce the daily quantity. Gulf contended that its existing source of supply was insufficient to meet this demand. Gulf did not show whether it had sufficient quantities of gas

---

lines of pipe, the failure of production facilities for causes other than depletion of the source of gas supply, and any other causes, whether of the kind herein enumerated or otherwise, not within the control of the party claiming suspension; provided, however, that said term shall not mean or include any cause which by the exercise of due diligence the party claiming force majeure is able to overcome; and provided, further, that in no event shall said term mean or include partial or entire failure or depletion of gas reserves or sources of supply of gas. Such term shall likewise include (a) in those instances whether either party hereto is required to obtain servitudes, rights of way grants, permits or licenses to enable such party to fulfill its obligations hereunder, the inability of such part to acquire, or the delays on the part of such party in acquiring, at reasonable cost and after the exercise of reasonable diligence, such servitudes, rights of way . . . .

563 F.2d 613–14.

available from specific fields to meet even its minimum daily obligation of 500 Mmcf.

To prove its *force majeure* claims, Gulf produced the "downtime" reports that it prepared whenever a field was shut down for any amount of time. Gulf prepared these reports immediately following each such incident and regularly notified Texas Eastern of its occurrence. Gulf classified each downtime as a *force majeure.* A shutdown occurred routinely, almost daily. Gulf's testimony also showed the use of preventive maintenance techniques to minimize the loss of production from shutdown fields. It appears that Texas Eastern never questioned Gulf's *force majeure* claims. (II App. p. 20–21).

Gulf showed a total deficiency of 307.2 Billion cubic feet ("Bcf") for the period August 1971 through December 1978. It catalogued by date the volumes of gas from particular fields *not delivered* to Texas Eastern. Gulf attributed 84.4 Bcf or about 27.5% of the undeliveries to *force majeure.* Therefore, it claimed that these were exempt from the refund calculation. (II App. p. 20).

Gulf classified the *force majeure* volumes according to contract provisions. Out of the total number of undelivered volumes due to *force majeure,* Gulf attributed 71.3% to "repairs to or alterations of machinery or lines of pipes"; 8.8% to pipe breakage; 8.7% to factors outside the "control of [Gulf]"; 7.6% to "storms"; 2.7% to "the failure of production facilities for causes other than depletion of the source of gas supply"; and 1% to "[frozen] . . . wells or lines, of pipes." (II App. p. 21).

WUL and other intervenors moved to strike Gulf's evidence at the conclusion of Gulf's evidentiary presentation on *force majeure* as insufficient as a matter of law. The ALJ treated the motion as a motion for summary judgment against Gulf, and granted it. (II App. pp. 12–26).

The ALJ held that Gulf had not made out a *prima facie* case to establish force majeure volumes. The ALJ required Gulf to establish a causal connection between the failure to deliver the volumes of gas that Texas Eastern demanded and alleged *force majeure* events. Consequently, in addition to cataloguing *force majeure* events that precluded Gulf from fulfilling delivery obligations, the ALJ required Gulf (1) to show that it was not able to produce gas from other sources to make up the deficiency; (2) to disclose the gas fields from which it ordinarily met Texas Eastern's daily delivery demands; (3) to show that all of its fields, the regular sources of supply as well as the reserve fields, were not capable of delivering the maximum amount of gas that Texas Eastern could demand; and (4) to establish that other sources of supply were unavailable to make up the deficiency. The ALJ found that only after showing these four requisites would Gulf have laid a foundation for excusing its non-performance because of *force majeure.* (II App. pp. 22–23).

The ALJ concluded that Gulf failed to make a *prima facie* case and that therefore its showing was inadequate to reduce its refund obligation. In order to show an excuse to performance, Gulf catalogued on a daily basis the same types of mechanical breakdowns as *force majeure* events. The ALJ labeled Gulf's presentation as a "mechanical exercise in pigeonholing volumes of gas" and required Gulf, in addition to proving *force majeure* occurrences, to show how it had tried to overcome these occurrences. (II App. at 25). Gulf Oil appealed to the Commission for reconsideration of the ALJ's decision.

### 2. *Opinion No. 136.*

The Commission reversed the ALJ's decision in Opinion No. 136 which held that the volumes of gas Gulf attributed to *force majeure* were accurate and reasonable. The Commission defined *force majeure* as found in Article X of the contract. It also required Gulf to show that it used due diligence to produce the daily contract quantity of gas upon the occurrence of a *force majeure* event. (II App. p. 33)

The Commission imposed and found that Gulf satisfied a two-part burden of proof.

The Commission required Gulf to identify the volumes which it had failed to deliver and then show that it used due diligence to make those deliveries. Relying upon prior Commission decisions and the Gulf-Texas Eastern contract, it required that Gulf establish specifically "(1) the volumes demanded by Texas Eastern (2) the volumes Gulf delivered (3) the deficiency volumes and (4) the portion of the deficiency volumes not delivered by reason of *force majeure* as defined in the contract." (II App. p. 38). The Commission found that Gulf met its showing of due diligence to overcome *force majeure* events by producing those reports that it routinely prepared whenever a *force majeure* event occurred. The Commission found Gulf's evidence that the wells were in operation 98.9% of the time satisfied such a showing.

The Commission based its decision on the total number of volumes warranted over the life of the contract. It identified Gulf's "unconditional warranty" as the delivery of 4.4 Tcf of gas over the 26-year contract period. (II App. p. 36). Gulf's "obligation to deliver available volumes which could otherwise be delivered, but for a *force majeure* event [was] suspended during the period in which the *force majeure* occurred." *Id.* Consequently, this meant that Gulf's daily delivery obligation under the warranty was merely to attach fields capable under optimal conditions of producing 625 Mmcf daily; it also meant that Gulf need only deliver gas from the reserve fields to the extent that it was prevented by any

specified *force majeure* event. *Id.* The Commission viewed the underdelivered volumes as simply a loss of time, not of gas. It therefore found that Gulf's refund should be reduced by the full extent of the specified *force majeure* events.

The Commission required Gulf to show the quantity of undelivered gas and the type of *force majeure* event which contributed to the underdelivery. It did not require a showing of Gulf's source of supply: the gas fields Gulf ordinarily relied upon and its reserve fields. Neither did it require Gulf to show the steps that it had taken to overcome particular events labeled as *force majeure* that occurred regularly.

II.

A. *The Standard of Review.*

This court initially reviews the Commission's order in light of the relevant facts to determine whether it either exceeds the Commission's authority or whether the Commission's order is an abuse of discretion. Section 19(A) of the Natural Gas Act of 1938, 15 U.S.C. § 717r (1970).[9] The court then examines each of the order's elements to determine if it is supported by substantial evidence. *American Paper Institute v. Train,* 543 F.2d 328 (D.C.Cir.1976), *cert. denied,* 429 U.S. 967, 97 S.Ct. 398, 50 L.Ed.2d 335 (1977). We find that the Commission's definition of *force majeure* and its application of that definition to the refund payment plan was in legal error. We find that

---

**9.** The scope of the court's review, is explained in the Administrative Procedure Act, 5 U.S.C. § 706 (1970).

Section 706 provides:
Scope of review
To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
(1) compel agency action unlawfully withheld or unreasonably delayed; and
(2) hold unlawful and set aside agency action, findings, and conclusions found to be—
(A) arbitrary, capricious, and abuse of discretion, or otherwise not in accord with law;

(B) contrary to constitutional right, power, privilege, or immunity;
(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
(D) without observance of procedure required by law;
(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

because Gulf did not prove how it tried to overcome *force majeure* occurrences, the Commission's order is not supported by substantial evidence.

### 1. *The Definition of Force Majeure in a Warranty Contract.*

We must decide here how a party's daily delivery obligation is affected by its *force majeure* claims. To determine whether the Commission abused its discretion in reducing Gulf's refund payment to Texas Eastern by those volumes of gas attributable to *force majeure,* we must review the Commission's definition and its application of *force majeure* to the calculation of the recoupment under the refund plan. The Commission defined the contract term to allow *force majeure* as an excuse to a party's performance whenever an event can be classified as one of the twenty-six listed in Article X of the contract. We find the Commission's definition in legal error within the context of a warranty contract.

We were referred to no cases in which a *force majeure* clause was decided within a warranty contract context. However, it is well settled that a *force majeure* clause in a non-warranty contract defines the area of unforeseeable events that might excuse nonperformance within the contract period. *United States v. Brooks-Callaway Co.,* 318 U.S. 120, 123–24, 63 S.Ct. 474, 476, 87 L.Ed. 653 (1943). Thus, to use the clause as an excuse to nonperformance, the event must have been beyond the party's control and without its fault or negligence. The nonperforming party has the burden of proof.

In *Brooks-Callaway,* a suit was brought by the nonperforming party to recover money deducted from the contract price as liquidated damages for delay in the completion of a contract for construction of levees on the Mississippi River. 318 U.S. at 121, 63 S.Ct. at 475. The contract contained a *force majeure* clause which required that events delaying performance be "beyond the control and without the fault or negligence of the contractor." *Id.* at 120–21 n. 1, 63 S.Ct. at 475 n. 1. The Supreme Court upheld a decision by the Court of Claims that the showing of the occurrence of an alleged *force majeure* event resulting in a delay in delivery did not constitute a *per se* claim to *force majeure* relief. To invoke *force majeure* and excuse performance, the nonperforming party's duty extends to showing what action it took to perform the contract regardless of the occurrence of the excuse. *Id.*

Within a warranty contract, a *force majeure* clause is appropriate; *Gulf Oil I,* 563 F.2d at 595; it excuses a party's nonperformance due to events outside of its control and without its fault or negligence. However its application differs from that of non-warranty ordinary contract. *Force majeure* events within a warranty contract can excuse the supplier's nonperformance for events beyond its control only to the extent that the supplier has shown that it had available resources to meet its warranty obligation. Thus, the supplier has the burden of proving that it had a quantity available greater than the maximum amount that could be demanded from it. When *force majeure* events affect the availability of both the regular source of supply as well as the reserve, and damage the system of delivery, the supplier's nonperformance is an excuse to delivery of the warranted amounts.

This court found in *Gulf Oil I* that the warranted daily quantity that Gulf was to deliver to Texas Eastern was a maximum of 625 Mmcf daily, unless Texas Eastern demanded less. *Gulf Oil I,* 563 F.2d at 602. The Commission's error in defining the volumes of gas attributable to *force majeure* was in viewing Gulf's daily warranty delivery requirements as conditional on having gas available only from its regular source of supply. The Commission understood Gulf's duty as "connecting additional reserves as necessary to meet its total obligation." (II App. at 36). This indicates that the Commission viewed Gulf's overall obligation as unconditional: Gulf must deliver by the expiration of the contract term the total amount of gas warranted. The Commission

viewed the daily deliveries as conditional on alleged *force majeure* events. It distinguished them from the overall deliveries because the delay was a temporary one. Therefore the Commission included in its definition of *force majeure* delays from temporary, yet anticipatory, events such as mechanical breakdowns or downtimes and maintenance repairs. These events were specified under the contract terms as *force majeure* events. However, the mere fact that the Commission did not require the parties to change the underlying contract does not mean that the contract terms are controlling. *Sun Oil Co. v. FPC,* 364 U.S. 170, 176, 80 S.Ct. 1388, 1391, 4 L.Ed.2d 1639 (1960); *Sunray Mid-Continent Oil Co. v. FPC,* 364 U.S. 137, 157–8, 80 S.Ct. 1392, 1403–1404, 4 L.Ed.2d 1623 (1960).

We find that the Commission's definition of *force majeure* is inconsistent with the underlying warranty. The warranty is to have a specific quantity of gas available daily from an unidentified source of supply. Article X becomes effective to excuse delay and the failure to meet the daily delivery obligations, if the delay caused by the listed events cannot be overcome from the regular or the reserve fields.

Our decision is based on the contract's daily warranty. The warranty provision in the Gulf-Texas Eastern contract is found in Article I, Paragraph 4. The contract terms require Gulf to have available a larger amount of gas than 625 Mmcf so that it can supply the maximum amount per day when demanded:

> 4. From and after the date of initial delivery of gas under this Agreement and throughout the remainder of the stated term thereof, Seller warrants and agrees that there will be provided under the terms and provisions of this Agreement *a quantity of gas sufficient to enable Seller to have available for delivery* hereunder on any day or days a volume not less than one hundred twenty-five per cent (125%) of the Daily Contract Quantity in effect from time to time under the provisions of Sub-paragraph 1(a) of Article II thereof.

*Gulf Oil I,* 563 F.2d at 613 (emphasis added). This obligation is separate and apart from Gulf's obligation over the contract period to deliver 4.4 Tcf of gas. The warranty clause in the contract supports the petitioners' claim that Gulf was warranting to have available reserves in excess of those capable of delivering 625 Mmcf of gas per day under optimum conditions. Gulf's intentions become clearer given its knowledge that all wells and equipment cannot operate consistently at maximum capability and the need for a significant amount of downtime for maintenance and repairs. Gulf does not allege that mechanical breakdowns and maintenance repairs are totally unforeseeable, but argues that the contract terms are to protect the parties from both foreseeable and unforeseeable events. (Answering Brief of Intervenor Gulf Oil in No. 82–3166, p. 30).

To support a definition of *force majeure* in a warranty contract, we must stress the element of uncertainty or lack of anticipation which surrounds the event's occurrence and must affect the availability and the delivery of gas. For example, the occurrence of a hurricane is a *force majeure* event. The resultant unavailability of gas follows from the occurrence of the event and carries with it the same amount of uncertainty. However, the effect of the event on the delivery of gas, the actual damage to the pipes, is not inferred from the event and thus does not carry the presumption of uncertainty. It is incumbent on Gulf to establish that the pipe damage and mechanical breakdowns in issue would not have occurred if there had not been a hurricane. Pipe damage occurs because of normal wear and tear and therefore can be anticipated. If the *force majeure* event causes the inability to deliver the gas rather than the inability to obtain the gas, the supplying party has the burden of proving that the inability to deliver was not caused by routine maintenance.

Furthermore, it is possible to accurately describe an event at its initial occurrence as unforeseeable and later because of the regularity with which it occurs, to find that such a description is no longer applicable.

Even presuming that Gulf's routine mechanical repairs were within the ambit of the *force majeure* clause, their frequent, almost predictable, occurrence takes them outside of a *force majeure* excuse to nonperformance. The element of uncertainty that defines unforeseeability is negated by the regularity with which the events occurred. It is not enough for Gulf to allege that because the mechanical repairs were listed in the contract, they were *force majeure* events. Nor is it enough for Gulf to defend the inclusion of such repairs in the contract clause because it is unable to determine the volumes of gas which might be lost under such circumstances.

▪ Finding support in the *Brooks-Calloway* rationale, we conclude that in order to invoke the use of *force majeure* as an excuse under the warranty contract, Gulf as the nonperforming party must show that even though the events which delayed its performance were unforeseeable and infrequent that it had available at the time of their occurrence more than the maximum warranted quantity of gas. This means that it must show that the availability of the gas as well as its delivery of it was affected by the occurrence of a *force majeure* event. Thus, we find that the Commission's definition and application of *force majeure* resulted in legal error. We therefore find that the refund calculations based on these volumes inaccurate.

### 2. The Due Diligence Showing.

▪ We must also review the findings of fact underlying the Commission's order to determine if they are supported by substantial evidence. We find that the Commission's decision was not based on a consideration of all the relevant factors. Specifically, we conclude that in order to use *force majeure* events to excuse nonperformance, Gulf must show that it tried to overcome the results of the events' occurrences by doing everything within its control to prevent or to minimize the event's occurrence and its effects.

Article X of the contract requires a showing of due diligence to overcome the event upon the occurrence of a *force majeure* event. The Commission found Gulf's regular reporting of *force majeure* events as listed in the contract categories sufficient to meet this standard. The Commission's finding that Gulf exercised due diligence to overcome the events does not detail the nature of that showing. The Commission accepted Gulf's testimony that it had undertaken the steps of a prudent pipeline producer to initiate or prevent the occurrence of the various *force majeure* events. The Commission also accepted as a showing of due diligence Gulf's careful and prompt categorizing of claimed *force majeure* events and the amount of gas lost from each of them. Gulf even demonstrated various ways in which it maximized deliveries from inadequate supplies thus minimizing alleged *force majeure* events. (II App. p. 38). The Commission looked favorably upon Gulf's preventive maintenance, its minimizing of downtimes, the nearly perfect percentage of times at which its wells and compressors operated, and its deferral of maintenance procedures so as not to hinder production. (II App. pp. 38–39). Although such showings are perhaps indicative of the occurrence of some *force majeure* events and of skillful management of the supply of gas, they do not meet the requisite burden of proof to excuse performance and thus satisfy a *force majeure* defense to delivery. *Brooks v. Calloway,* 318 U.S. at 123, 63 S.Ct. at 476; *Jennie-O Foods Inc. v. United States,* 580 F.2d 400, 408 (Ct.Cl.1978).

The Commission distinguished the burden of proof imposed by the court in *Jennie-O* from this case because in *Jennie-O,* the contracting parties sought a permanent excuse from performance rather than temporary suspension. The Commission's reasoning was based on Gulf's warranty obligation over the life of the contract. (II App. 35, n. 17). We find such a distinction unnecessary, especially given our earlier discussion of the divisibility of the daily quantity requirement from the total quantity requirement. The parties in *Jennie-O,* similar to the parties here, were seeking to reduce liquidated damages required in the event of

delay. The liquidated damages are similar to the monetary damages under the refund plan because they tend to compensate the party who was not at fault in causing the delay.

■ For *force majeure* events to excuse nonperformance, some correlation must be drawn between the occurrence of an event and the obligation of the nonperforming party. *Brooks-Calloway,* 313 U.S. at 123, 63 S.Ct. at 476; *Jennie-O,* 580 F.2d at 400. We think that Gulf must show that it exercised due diligence to overcome the effects of the specific *force majeure* events. Gulf must show that it tried to limit the problem and was not able and that it did everything in its control to prevent or minimize its happening. Gulf must show that its source of supply was either unavailable or undeliverable due to *force majeure* occurrences. To show that its source of supply was unavailable or undeliverable, Gulf must prove that despite its efforts, it was not able to produce its maximum daily contract warranty of 625 Mmcf from either its regular or its reserve sources.

Gulf's nonperformance will be excused because of *force majeure* events that affect either its source of supply or its ability to deliver gas. To defend nonperformance due to the supply of gas, Gulf must show a correlation between a deficiency in supply and overcoming that deficiency. Specifically, Gulf must identify each of its fields, those which it relies upon for the regular sources of supply and those for the reserve; it must demonstrate the amount of gas that each field is capable of producing on a daily basis; it must identify which fields the *force majeure* events affected and show the amount of gas that each field produced on the day that the *force majeure* event occurred. Then, Gulf would have determined the number of deficit volumes from unavailable sources of supply due to *force majeure* events.

To defend nonperformance due to mechanical breakdowns, Gulf must show that although the gas was available, the *force majeure* event caused its inability to deliver the gas. It has the burden of proving that the accidents, alterations, repairs or failure of production facilities were a result of a *force majeure* event. It must show the notice of the breakdown that it gave; the daily quantity of gas that is produced through the damaged pipe or pipes; the amount of time that the repair took; and the number of volumes undelivered due to that repair. The mere fact that a routine repair occurred unexpectedly will not constitute a claim of undelivery due to *force majeure* events. Gulf must prove the number of deficit volumes undelivered due to a *force majeure* event that caused the mechanical breakdown.

The contract term requiring a showing of due diligence should be interpreted to require Gulf to act expeditiously and efficiently in cataloging those volumes of gas attributable to *force majeure* events. This standard does not mean that Gulf is excused from proving how it tried to overcome the effects of a *force majeure* event.

■ Examining those volumes attributable to *force majeure* events that Gulf presented, we agree with the ALJ that, with the exception of the category listed "storms," the contract categories are obscure. Storms qualify as a *force majeure* event because they are unexpected, and out of the party's control. (II App. p. 21). The occurrence of such events and nonperformance due to the unavailability or undeliverability of supply is plausible. A showing of the occurrence of those events on a specific date, and an identification of the fields affected, will constitute some evidence for a defense. Nevertheless, the nonperforming party must still prove how it tried to overcome the event and its effects. The connection between the other listed categories and *force majeure* events is too tenuous to make the clause effective without a stronger connection between the event and the nonperformance due to its occurrence. Because Gulf's evidence does not prove how it tried to overcome the results of *force majeure* events, we find that the Commission's order on the *force majeure* issue was not supported by substantial evidence and therefore must be reversed.

### III. CONCLUSION

Based on the foregoing we find that the Commission's order in Opinion No. 136 reducing Gulf's refunds to Texas Eastern by the volumes of gas attributable to *force majeure* was in error. We will therefore reverse the Commission's order on the *force majeure* issue and remand that case to the Commission for a determination of the appropriate number of volumes attributable to *force majeure* in a way that is consistent with this opinion.[10] We will affirm the other orders of the Commission.[11] Costs taxed against petitioner in Nos. 82–3035, 82–3242, 82–3132. Costs taxed against respondent in C.A. Nos. 82–3166 and 82–3167. On 82–3137, each party to bear its own costs.

---

**10.** Nos. 82–3166/67. No. 82–3137 is reversed *in part.*

**11.** Nos. 82–3035, 82–3132, 82–3137, and 82–3242.